# UNITED STATES COURT OF APPEALS
## Tenth Circuit
## Byron White United States Courthouse
## 1823 Stout Street
## Denver, Colorado 80294
## (303) 844-3157

**Patrick J. Fisher, Jr.**
**Clerk**

**Elisabeth A. Shumaker**
**Chief Deputy Clerk**

February 24, 1997

**TO:**   All recipients of the captioned opinion

**RE:**   No. 95-2100, USA v. Leos-Quijada
February 20, 1997


Please be advised of the following correction to the captioned decision:

On the first page of the concurrence and dissent, the letter "R" is shown as the first initial for Judge McWilliams. The letter should be "J" for judge.

A corrected version is attached for your convenience.

Very truly yours,

Patrick Fisher, Clerk


Susie Tidwell
Deputy Clerk


encl.

PUBLISH

F I L E D
United States Court of Appeals
Tenth Circuit

FEB 20 1997

PATRICK FISHER
Clerk

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

v.

REGINALDO LEOS-QUIJADA,

        Defendant - Appellant.

No. 95-2100

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. NO. 94-CR-217-MV)**

John B. Leyba, Las Cruces, New Mexico, for Appellant.

Charles L. Barth, Assistant U.S. Attorney (John J. Kelly, United States Attorney, with him on the brief), Albuquerque, New Mexico, for Appellee.

Before ANDERSON, McWILLIAMS, and WEIS[*], Circuit Judges.

**ANDERSON**, Circuit Judge.

---

      [*]Honorable Joseph F. Weis, Jr., Senior Judge, United States Court of Appeals for the Third Circuit, sitting by designation.

-2-

Appellant Reginaldo Leos-Quijada was charged with one count of aiding and abetting in the importation of more than 50 kilograms of marijuana in violation of 21 U.S.C. §§ 952(a), 960(a)(1) and (b)(3), and 18 U.S.C. § 2, and one count of aiding and abetting in the possession of marijuana, with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and 18 U.S.C. § 2. Leos-Quijada filed a motion to suppress evidence obtained as a result of a traffic stop that allegedly violated his Fourth Amendment rights. After an evidentiary hearing, the district court denied the motion to suppress. Leos-Quijada subsequently went to trial and the jury acquitted him of the importation charge, but convicted him of aiding and abetting the possession of marijuana with intent to distribute. Leos-Quijada now appeals his conviction arguing that (1) the district court erred in denying his pretrial motion to suppress evidence; (2) the evidence presented at trial was insufficient to support the conviction for aiding and abetting in the possession of marijuana with intent to distribute; and (3) the prosecutor's alleged misconduct during closing argument denied him his constitutional right to a fair trial. We reverse.

# I. **Background**

The evidence adduced at the suppression hearing revealed the following facts. On March 17, 1994, Deputy Schneider of the Hidalgo County Sheriff's Office in Animas, New Mexico,[1] received a call at 6:50 a.m. from a confidential informant who said that a vehicle was parked at an area called Taylor Mill. The confidential informant had not personally observed the vehicle, but was relating information from a third party, the grandson of the owner of Taylor Mill, who

---

[1]Deputy Schneider testified at trial that, because the Sheriff's Office is close to the border, he and the other officers are cross-certified as United States Customs Agents.

had called her to report an unfamiliar vehicle at Taylor Mill. The confidential informant explained that she was concerned because the vehicle was on private property and might have been criminally trespassing. Based on this information, Deputy Schneider drove southbound on state road 338 toward Taylor Mill. While en route, Deputy Schneider received another call from the confidential informant who said that since her first report, she had driven toward Taylor Mill and personally observed the vehicle with field glasses or binoculars from a quarter to half mile distance.[2] She confirmed the vehicle description which she had relayed earlier as a silver or gray Jeep Cherokee with Arizona license plates occupied by two males. She then reported that the vehicle had left Taylor Mill heading northbound on state road 338 at a "high rate of speed." The average volume of traffic on this segment of state road 338 includes about five or six vehicles on "a real busy day." R. Vol. II at 75-76. Shortly after Deputy Schneider learned that the vehicle was traveling northbound, he observed a vehicle matching the description, and occupied by two males, heading toward him at a high rate of speed. He immediately turned around and pulled the vehicle over without incident. The stop took place about fifteen miles from Taylor Mill.

Deputy Schneider testified that he pulled the vehicle over based on the tip from the confidential informant, which he believed revealed a number of suspicious factors. First, he considered the confidential informant reliable because she had provided previous tips to the Hidalgo County Sheriff's Office and the Border Patrol regarding possible drug smuggling loads, illegal aliens, and people wanted for other crimes. Based on her previous tips, Deputy Schneider personally had discovered three marijuana loads. Deputy Schneider testified that her tips led to

---

[2]At the trial, Deputy Schneider testified that subsequent to the suppression hearing he spoke to the confidential informant and she informed him that she was probably within an eighth or quarter mile of the vehicle when she observed it through field glasses.

successful apprehension approximately fifty percent of the time.[3]  Deputy Schneider also testified

that the vehicle seemed suspicious because it was parked in the Taylor Mill area about fifteen

miles north of the Mexican border.  Taylor Mill is private property with two windmills and a set

of corrals owned by Gray Ranch as part of a "viable cattle operation."  R. Vol. II at 13.  It is an

isolated desert area approximately 125 yards away from state road 338 and is accessed by a dirt

road.  The area is the center of a known trail for smuggling aliens and narcotics from Mexico.  Id.

at 46-48.

After stopping the vehicle because he suspected the occupants might be involved in

smuggling narcotics or aliens, Deputy Schneider called the license plate number into the

dispatcher.  He then approached the vehicle on the driver's side and asked the driver, in his

limited Spanish, to produce a driver's license.  The driver, Leos-Quijada, indicated that he did

not have a driver's license but provided a resident alien card.  Deputy Schneider then asked the

passenger, Hector Haro-Banuelo, where he lived and he replied Mexico.  But when asked for

identification or immigration documentation, Haro-Banuelo could not provide any.  Deputy

Schneider testified that because the men apparently spoke little English, he had difficulty

communicating with them.

After discovering that Leos-Quijada did not possess a driver's license and that Haro-

Banuelo was a resident of Mexico who could not provide identification or documentation,

Deputy Schneider returned to his car and radioed Deputy Umphries to provide backup and the

---

[3]At oral argument and in his brief, appellant suggested that Deputy Schneider testified
that the confidential informant's previous tips were "accurate only fifty percent of the time."
Appellant's Brief at 6.  However, a careful review of Deputy Schneider's testimony reveals he
stated that the confidential informant's tips led to successful apprehension fifty percent of the
time, not that her tips were accurate fifty percent of the time.  See R. Vol. II at 32, 39.

Border Patrol to provide Spanish assistance and to check on Haro-Banuelo's immigration status. Deputy Schneider then checked New Mexico and Arizona driver records and found no information on Leos-Quijada. Deputy Schneider testified that under the laws of New Mexico, Leos-Quijada could not drive without a valid license. Deputy Schneider testified that while he was waiting for backup to arrive, Leos-Quijada was "very cool, calm, [and] possessed," while Haro-Banuelo was "exceedingly nervous." R. Vol. II at 41. Before the other officers arrived, Deputy Schneider received the license plate check results indicating that the vehicle was not registered to either Leos-Quijada or Haro-Banuelo, but rather to an owner from Tucson, Arizona, with an English surname.

Deputy Umphries, a narcotics officer, arrived within ten to twenty minutes of the initial stop. Deputy Umphries interviewed both Leos-Quijada and Haro-Banuelo, asking them where they were coming from and where they were going. Leos-Quijada told him they were going to work in Animas at a ranch owned by Don Lakateka for whom Leos-Quijada had previously worked. Deputy Umphries testified that this story was suspicious because he knew all the ranch owners in Animas and he had never heard of Lakateka or any similar name. Haro-Banuelo, on the other hand, told Deputy Umphries they were looking for work on a farm to pick chile. Deputy Umphries considered the men's stories inconsistent and implausible. He testified that there are no chile ranches in the area and that it was not chile picking season. Deputy Umphries then asked Leos-Quijada if he had any money, narcotics, or other contraband in the vehicle, to which he responded in the negative. Deputy Umphries asked if he could search the vehicle and Leos-Quijada consented. Deputy Umphries testified that he asked to search because the vehicle had come from Taylor Mill, a known narcotics smuggling area, and because he smelled a strong

scent of air freshener, a known cover scent for marijuana. Deputy Umphries found no drugs or drug residue, but he did find a small bottle of air freshener in front. He did not find any work clothes or lunches, which he found inconsistent with the men's stories that they were going to work.

Deputy Umphries testified that he believed the men had gone to Taylor Mill to pick up a load of marijuana, basing his conclusion on the following facts: Haro-Banuelo was nervous, the presence of a cover scent, the inconsistent stories, the vehicle registered to another owner, and the "suspiciously clean vehicle." He explained that the vehicle was suspiciously clean because there were no clothes, lunches, stray soda cans, or any other personal belongings typically found in vehicles. He further testified that this was consistent with drug smuggling because all the space would be needed for the narcotics.

Border Patrol Agent Hackworth, who speaks Spanish fluently, arrived at the scene at about 7:40 or 7:45 a.m. Upon Deputy Schneider's request, Agent Hackworth asked Leos-Quijada about the status of his driver's license and asked both men about their citizenship. Leos-Quijada indicated that he last had a driver's license in California which was suspended in 1986. The officers called the dispatcher who ran a driver's license search in the California records and confirmed that Leos-Quijada's license was suspended in 1986 for driving while intoxicated. In response to Agent Hackworth's questions about citizenship, both men indicated they were citizens of Mexico. Haro-Banuelo said he entered the United States on visitor status in 1992. He said he had been granted two week visitor status, which led Agent Hackworth to conclude that Haro-Banuelo had overstayed his visit by about two years. Haro-Banuelo also indicated that he had been working in the United States, which Agent Hackworth knew violates visitor rules.

Agent Hackworth arrested Haro-Banuelo as an illegal alien and advised him of his Miranda rights. Haro-Banuelo agreed to speak and told Agent Hackworth that Leos-Quijada knew Haro-Banuelo was in the United States illegally. Based on this information, Agent Hackworth arrested Leos-Quijada for transporting an illegal alien. Deputy Schneider issued a ticket to Leos-Quijada for driving on a suspended license and then released both men to Agent Hackworth's custody.

The evidence at trial regarding the information from the confidential informant, the traffic stop, and the eventual arrest of Haro-Banuelo and Leos-Quijada was consistent with that revealed at the suppression hearing. At trial, Deputy Schneider further testified that during the course of the traffic stop he also became suspicious that Leos-Quijada and Haro-Banuelo were involved in drug smuggling based upon his experience in investigating drug smuggling and several factors--a vehicle registered to a third party, a vehicle with Arizona license plates because most of the drugs are going to Tucson or Phoenix, a recreational vehicle, tinted windows, Leos-Quijada had only a resident alien card and Haro-Banuelo had no identification, Haro-Banuelo was an undocumented alien, and the vehicle was suspiciously clean.

The officers suspected that Leos-Quijada and Haro-Banuelo were at Taylor Mill at 6:50 a.m. to pick up a load of narcotics, but that they were scared away when they saw the confidential informant approach in her vehicle. Deputy Umphries and Agent Villa, a border patrol agent who had arrived sometime after Agent Hackworth, devised a plan to determine whether Leos-Quijada and Haro-Banuelo had gone to Taylor Mill to pick up drugs. Deputy Umphries testified that, based on his experience in conducting surveillance of drug smuggling, the occupants of "load vehicles" often drive to the location where they are supposed to meet the mules and honk the horn and whistle to call the drug mules to the vehicle to make the drug exchange. Deputy

-8-

Umphries testified that in his experience the mules commonly do not know the people that are coming to pick up the load, but rather only "know the vehicle" they are supposed to meet. R. Vol. IV at 142. He did not explain, however, what particular characteristics of the vehicle are known to the drug mules.

Because Agent Villa and Deputy Umphries were both wearing plain clothes and because Deputy Umphries was driving an unmarked Chevy S-10 Blazer which was "[s]imilar in color" to the Jeep Cherokee, Id. at 118, the officers decided to drive Deputy Umphries' vehicle to Taylor Mill to pose as those they believed were going to pick up narcotics. When they arrived at Taylor Mill the officers discovered footprints, which Agent Villa testified matched those of Leos-Quijada, and tire tracks which matched those of the Jeep Cherokee that Leos-Quijada was driving. Agent Villa testified that the footprints and tire tracks indicated that Leos-Quijada had been in the Jeep Cherokee which the confidential informant had seen parked at Taylor Mill and that Leos-Quijada had exited the vehicle and stood near the vehicle. Next, the officers blew the vehicle horn several times and whistled.

Deputy Umphries testified that within a few moments a man "came out of the brush, down a canyon and was running towards [their] location." Id. at 119. The individual was motioning to the officers to come toward him. When the officers did not come toward him, he came closer. When the individual got close to the vehicle, he suddenly stopped and then changed his route. Because of the significance of this event, we recount the specific testimony of each officer. Deputy Umphries testified:

> He was making a beeline for our vehicle. He appeared to me that he recognized that we weren't exactly the people that he was supposed to meet with. He turned

and went down a fence line to the windmill and got a drink of water. Then he crossed over a fence, separating him from us and the pasture.

Id. at 120.

Agent Villa testified:

He jumped over the fence and was walking toward us and he was waving to us because he thought he was recognizing, or, you know, he displayed that in his face that you might be, you know recognizing us and as he drew closer to us he stopped and you could tell in his face that, you know, we were not the people that he was supposed to encounter, or meet up with and he stopped short . . . .

Id. at 148-49.

The officers exited the vehicle, coaxed the man over to them, determined that he was illegal, and arrested him. The officers found grass twine in his pockets which is consistent with narcotics smuggling because it is used to tie the burlap sacks which contain the narcotics. Agent Villa backtracked the man's footprints until he discovered the tracks of six to seven individuals, which indicated that the people were walking toward Taylor Mill and then turned and ran away in a westwardly direction. Agent Villa followed the tracks on foot while other officers drove in vehicles.[4] The officers in vehicles spotted six people in a canyon and the individuals turned and started running. The officers stopped them, discovered they were also illegal, and arrested them. The officers arrested these men approximately a mile to a mile and a half from Taylor Mill. Agent Villa then backtracked the six sets of footprints which led him to bundles of marijuana.

Agent Villa found the marijuana in a bushy area at the bottom of a creek bed. It was found approximately one half of a mile to a mile west of Taylor Mill and a little bit north. It was packed in cellophane bags enclosed in burlap sacks tied with twine similar to that found on the

---

[4]At some point Deputy Schneider and Deputy Latham had arrived at Taylor Mill to provide assistance.

first man the officers encountered at Taylor Mill, as well as on several of the six suspects found near the marijuana. Deputy Schneider testified that in his experience it is common for drug smugglers to put marijuana in burlap sacks tied with twine to form makeshift "backpacks" which allows the smugglers to carry the marijuana on their backs or shoulders for long distances. One of the six backpackers told Agent Villa that they were supposed to carry the marijuana to the windmill. Agent Johnson testified the marijuana had an estimated value of $120,000 and weighed about 145.9 pounds, an amount consistent with distribution.

## II. Motion to Suppress

Leos-Quijada contends that Deputy Schneider did not have reasonable suspicion warranting the investigatory stop and, thus, the evidence obtained as a result should have been suppressed. The district court held that Deputy Schneider had reasonable, articulable suspicion because the confidential informant provided information about the vehicle which was sufficiently detailed, and Deputy Schneider verified the description of the vehicle when he encountered it on the road.[5] We agree with the district court that the initial stop was lawful.

In reviewing the denial of a motion to suppress, we accept the factual findings of the district court unless they are clearly erroneous and we view the evidence in the light most

---

[5]In its brief and at oral argument, the government contended that the initial stop was reasonable based on Deputy Schneider's observation of the vehicle speeding. We agree that under Whren v. United States, 116 S. Ct. 1769, 1774 (1996), such an observed traffic violation would justify the initial stop regardless of whether Deputy Schneider's true motive was a hope of discovering drugs, illegal aliens, or other illegal activity. However, the district court did not make any findings of fact regarding whether or not Deputy Schneider observed a traffic violation. Accordingly, we decline to rely on such a basis when specific findings of the district court regarding the tip from the confidential informant are sufficient to uphold the legality of the stop.

-11-

favorable to the government. United States v. Botero-Ospina, 71 F.3d 783, 785 (10th Cir. 1995), cert. denied, 116 S. Ct. 2529 (1996). The ultimate determination of whether the traffic stop and subsequent detention were reasonable under the Fourth Amendment is a question of law which we review de novo. Id.

A traffic stop is an investigative detention which we analyze according to the principles set forth in Terry v. Ohio, 392 U.S. 1 (1968). Botero-Ospina, 71 F.3d at 786. In order to conduct a lawful investigatory stop of a vehicle, the detaining officers must have, based on all the circumstances, "a particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 417-18 (1981); see also United States v. Lambert, 46 F.3d 1064, 1069 (10th Cir. 1995) (an investigative detention must be supported by "articulable suspicion" that the person is engaged in criminal activity). In this case, Deputy Schneider suspected Leos-Quijada was involved in criminal activity--either smuggling drugs or illegal aliens from Mexico--based on the tip from the confidential informant, as well as his own observations.

A confidential tip may justify an investigatory stop if under the totality of the circumstances the tip furnishes both sufficient indicia of reliability and sufficient information to provide reasonable suspicion that criminal conduct is, has, or is about to occur. Alabama v. White, 496 U.S. 325, 328-30 (1990); United States v. Elkins, 70 F.3d 81, 83 (10th Cir. 1995). In determining whether under the totality of the circumstances the tip is sufficiently reliable to provide reasonable suspicion, we consider the credibility or veracity of the informant, the basis of the informant's knowledge, and the extent to which the police are able independently to verify the reliability of the tip. White, 496 U.S. at 328-29, 331-32 (discussing credibility of informant

-12-

and police verification as factors in assessing reliability of tip); <u>Adams v. Williams</u>, 407 U.S. 143, 147-148 (1972) (same); <u>Illinois v. Gates</u>, 462 U.S. 213, 230 (1983) (discussing all three factors in assessing reliability of tip in context of probable cause); <u>Elkins</u>, 70 F.3d at 83 (discussing police verification in assessing reliability of tip); <u>United States v. Melendez-Garcia</u>, 28 F.3d 1046, 1051 (10th Cir. 1994) (same).

There was testimony in this case establishing the reliability of the informant and her tip-- Deputy Schneider testified her previous tips resulted in the discovery of at least three marijuana loads and led to successful apprehensions approximately fifty percent of the time. <u>See</u> <u>United States v. Gonzales</u>, 897 F.2d 504, 507 (10th Cir. 1990) (affirming district court's implied finding that informant was reliable based on police officer's testimony that informant had been used as a source before, and that informant was "very much" a "reliable citizen type," who "was reliably in a job position"). Furthermore, although the confidential informant initially provided information from a third party, she later confirmed the information and provided further information about the vehicle based on her personal observations. Finally, Deputy Schneider was able to corroborate some of the details of the confidential informant's tip when he encountered the vehicle; he noted that the vehicle was occupied by two males, was traveling northward, was traveling at a high rate of speed, and fit the description relayed by the informant. In view of the limited scope of our review, we accept the district court's apparent conclusion that the confidential informant and her tip were reliable.

Thus, we turn to the content of the information provided by the confidential informant. The informant received information from the grandson of the owner of Taylor Mill that a sports utility vehicle, a vehicle capable of carrying large quantities of narcotics or a number of illegal

aliens, was parked at Taylor Mill. The fact that the information first came from the grandson of the owner of Taylor Mill suggested that the occupants of the vehicle did not have permission to be on the private property. Moreover, the fact, based on the informant's personal observations, that the vehicle was parked on the isolated private property in the desert fifteen miles north of Mexico, apparently without permission, indicated that the occupants likely had no legitimate reason to be there. The informant also saw the vehicle leave the area at a "high rate of speed," suggesting that the occupants of the vehicle had seen the confidential informant approach in her vehicle and were leaving quickly to avoid detection. The informant gave Deputy Schneider a detailed description of the vehicle and reported that the vehicle was heading northbound. Deputy Schneider was confident that the vehicle he stopped was the same one which the informant had seen parked at Taylor Mill because of the confirmed details of the report and the extremely minimal amount of traffic (five or six cars on a busy day) on that segment of the road.

In determining whether an officer had reasonable suspicion warranting an investigative stop, a court may consider the characteristics of the area, its proximity to the border, the usual traffic patterns on the road, and the officer's previous experience with illegal trafficking in the area. United States v. Brignoni-Ponce, 422 U.S. 873, 884-85 (1975); United States v. Barbee, 968 F.2d 1026, 1028 (10th Cir. 1992). Considering these factors and the other facts in this case, we conclude that Deputy Schneider was entitled to stop the vehicle to investigate further his suspicions that the occupants were involved in smuggling activities. In an analogous line of cases, the Supreme Court and we have held that under similar circumstances border patrol agents had reasonable suspicion to stop vehicles to investigate further whether the occupants were involved in smuggling narcotics or aliens from Mexico. See, e.g., Cortez, 449 U.S. at 421 (based

-14-

on investigation of footprints in Arizona desert area known for alien smuggling, agents suspected an alien "pickup" would occur in the area and were entitled to stop a camper for the "limited purpose . . . to question the occupants of the vehicle about their citizenship and immigration status and the reasons for the round trip in a short time span in a virtually deserted area"); United States v. Cantu, 87 F.3d 1118, 1122 (10th Cir.) (agents had reasonable suspicion to stop vehicle as suspected "scout" vehicle after finding a load of marijuana in vehicle which had approached checkpoint immediately after suspected scout vehicle, driver of suspected scout vehicle had told agent at checkpoint that passenger was a United States citizen when she was not, occupant of suspected scout vehicle had told checkpoint agent that they were traveling home in a certain direction when the license plate on the vehicle was from a state in a different direction, and after uncovering the marijuana in the load vehicle the scout vehicle was seen traveling back toward the checkpoint inconsistent with the stated travel plans), cert. denied, 117 S. Ct. 265 (1996); see also United States v. Lopez-Martinez, 25 F.3d 1481, 1485-87 (10th Cir. 1994).

Therefore, because Deputy Schneider's stop of Leos-Quijada was predicated on reasonable articulable suspicion, the district court properly denied the motion to suppress and admitted the evidence at trial.

### III. Sufficiency of the Evidence

Leos-Quijada asserts that the government offered insufficient evidence to prove beyond a reasonable doubt that he knowingly or intentionally possessed marijuana with the intent to distribute. The trial court acknowledged that the evidence was "somewhat weak . . . connecting

this defendant to those individuals in the desert." R. Vol. IV at 184. Nonetheless, the court denied the defense motion for judgment of acquittal.

"We review a district court's denial of a motion for judgment of acquittal viewing all the evidence and drawing all reasonable inferences in the light most favorable to the prosecution." United States v. DeLuna, 10 F.3d 1529, 1553 (10th Cir. 1993) (quoting United States v. Young, 954 F.2d 614, 616 (10th Cir. 1992)). The motion must be denied if any rational trier of fact could have found each essential element of the crime beyond a reasonable doubt. Id. Although the jury may draw reasonable inferences from direct and circumstantial evidence, such inferences must be more than speculation and conjecture in order to be reasonable, and the conviction must not be obtained by piling inference upon inference. United States v. Jones, 49 F.3d 628, 633 (10th Cir. 1995); United States v. Jones, 44 F.3d 860, 865 (10th Cir. 1995). Moreover, the evidence supporting conviction must be substantial and must do more than raise a mere suspicion of the defendant's guilt. United States v. Torres, 53 F.3d 1129, 1133-34 (10th Cir.) (citing United States v. Sanders, 928 F.2d 940, 944 (10th Cir. 1991)), cert. denied, 115 S. Ct. 2599, and, 116 S. Ct. 220 (1995).

The prosecution's theory of the case, as demonstrated by the prosecutor's opening statement and closing argument, was that the seven people arrested at or near Taylor Mill had actual or constructive possession[6] of the marijuana which they had carried or "backpacked" to that location as part of a criminal venture in which Leos-Quijada participated by driving the load

---

[6]The district court instructed the jury that "[a] person, who although not in actual possession, knowingly has both the power and the intention at a given time to exercise dominion or control over a thing either directly or through another person or persons is then in constructive possession of it." R. Vol. IV at 201.

-16-

vehicle to Taylor Mill to pick up the drugs.  Accordingly, the prosecution argued, Leos-Quijada aided and abetted in the possession of marijuana with intent to distribute.

"Whoever . . . aids, abets, counsels, commands, induces or procures [the] commission [of a crime] is punishable as a principal."  18 U.S.C. § 2(a).  To be guilty of aiding and abetting the commission of a crime, the defendant must willfully associate himself with the criminal venture and seek to make the venture succeed through some action of his own.  United States v. McKneely, 69 F.3d 1067, 1072 (10th Cir. 1995); DeLuna, 10 F.3d at 1533-34.  Participation in the criminal venture may be established by circumstantial evidence and the level of participation may be of "relatively slight moment."  McKneely, 69 F.3d at 1072 (quotations omitted); United States v. Esparsen, 930 F.2d 1461, 1470 (10th Cir. 1991).  The issue we face is whether the government presented sufficient evidence for a reasonable jury to conclude beyond a reasonable doubt that Leos-Quijada drove to Taylor Mill to pick up the drugs.  We conclude that the government did not present sufficient evidence.

The government relies on the following evidence to prove that Leos-Quijada went to Taylor Mill to pick up the drugs.  Leos-Quijada was parked in the Jeep Cherokee at Taylor Mill at 6:50 in the morning, got out of the vehicle and stood near it, and then left at a high rate of speed shortly after the confidential informant approached in her vehicle.  An hour or so later officers returned to Taylor Mill in a sports utility vehicle of a similar color to the Jeep Cherokee. Deputy Umphries testified that he believed this decoy might work because in his experience the drug mules often only "know the vehicle" which is supposed to meet them.  R. Vol. IV at 142. Consistent with the signals which in their experience had been used by the occupants of load vehicles to alert drug mules, the officers honked and whistled.  Soon thereafter a man emerged

-17-

from the desert and ran towards them, but apparently realizing that the officers were not the people he was supposed to meet, he altered his direction as if to avoid them. After the officers arrested the man, Agent Villa backtracked his footprints to the other six individuals in the desert and then backtracked their footprints to the marijuana. All of this occurred in the early hours of the morning in an isolated desert area known as a trail for drug smuggling.

This case requires the fact finder to pile inference upon inference in order to conclude that Leos-Quijada participated in a criminal venture to possess and distribute drugs. First, the fact finder must infer that Leos-Quijada went to Taylor Mill to alert the drug mules in the desert to bring the drugs to the vehicle. However, there was no evidence that Leos-Quijada or Haro-Banuelo honked, whistled, or otherwise attempted to communicate with the persons hiding in the desert.

Second, the fact finder must infer that the man in the desert knew the type of vehicle he was supposed to meet and that he approached the officers because they were driving a vehicle similar enough to be confused with the Jeep Cherokee. Besides Deputy Umphries' testimony that the mules often "know the vehicle" they are supposed to meet, there was no evidence that these mules were supposed to meet a certain vehicle or the characteristics of the vehicle. While one backpacker admitted that they were supposed to carry the drugs to the windmill, he did not indicate who they were supposed to meet or how they were to identify the person or persons. Further, while the jury certainly could have concluded that sport utility vehicles of different makes but of like color are very similar, there is no evidence that the man in the desert was responding to the vehicle. Agent Villa testified that the man "was recognizing, or, you know, he displayed that in his face that you might be, you know recognizing us," but there was no evidence

whether the display of recognition was directed at the silver or gray colored sports utility vehicle, at the physical characteristics of the officers, at the honking and whistling of the officers, or merely the location of the officers near the windmills.

Third, the fact finder must infer that the man in the desert responded to the officers for the purpose of making a drug exchange. While this inference is certainly reasonable, it is an inference tacked on to a string of inferences such that the jury's final determination that Leos-Quijada aided and abetted the possession of drugs with intent to distribute is too speculative.

The government also relied on a number of factors which did not specifically link Leos-Quijada to the drugs in the desert, but which, according to the officers, indicated that he fit the profile of the driver of a load vehicle. Leos-Quijada and Haro-Banuelo were suspicious because Haro-Banuelo was nervous, they told inconsistent stories about their travel plans, they had no clothing or lunches appropriate for the work they claimed to seek, and Leos-Quijada had little identification while Haro-Banuelo had no identification. The Jeep Cherokee was suspicious because of the presence of a strong air freshener scent and the bottle of air freshener, it was registered to a third party in Arizona, it was exceedingly clean, it was a sport utility model capable of carrying a large cargo, and it had tinted windows. While most of these factors are consistent with innocent behavior, they are relevant, especially in aggregate, of drug activity. Nonetheless, they are not enough to transform the government's weak evidence connecting Leos-Quijada to the particular drug venture near Taylor Mill into proof beyond a reasonable doubt.

In a similar case, we found the evidence of a defendant's proximity to illegal activity and other suspicious factors insufficient to prove guilt beyond a reasonable doubt. United States v.

McMahon, 562 F.2d 1192 (10th Cir. 1977), involved an appeal by a defendant who was convicted by a jury of aiding and abetting the transportation of illegal aliens. The evidence was that a directional sensor device near the border registered the passage of two vehicles in a short time span on a road known as a route to avoid the checkpoint. The border patrol agents went to the area and saw a car with a CB antenna but did not see a second vehicle follow. The agents returned to the checkpoint and later the sensor again registered two vehicles. The agents went to the area and saw the same car with a CB antenna but did not see a second vehicle. This time the agents concluded that a second vehicle did not follow because the car was warning the vehicle via CB that the agents were in the area. The agents quickly headed toward a high spot where they could see a truck heading away from the sensor and upon stopping the truck they discovered it contained eleven illegal aliens. The agents then proceeded back in the direction of the car and found that the car had turned around and stopped on the side of the road. The defendant was driving the car and the agents learned that he and a passenger in the truck were brothers-in-law. The officers also located CB radios in both vehicles.

The government's theory in McMahon was that the defendant aided and abetted the criminal venture by driving a "scout car" to warn the truck of the location of the border agents, that the vehicles communicated by CB radios, that both times when the border patrol agents arrived at the area and saw the scout car, the truck did not follow because the car had warned the truck via CB radio that the agents were in the area, and that when the agents were able to stop the truck by quickly driving to a high spot, the defendant's car had turned around to check what had happened to the truck. We determined that the government's circumstantial case of aiding and abetting was insufficient to support the conviction. After considering all the circumstantial

-20-

evidence, we noted that "there was no proof of any incriminating contacts by defendant with the load car occupants." Id. at 1196. We concluded that "the observation of the [car] in the general vicinity and its movement do not reasonably support an inference that the defendant was aiding the movement of the aliens with the requisite knowledge to establish criminal intent. Mere presence in such circumstances may create suspicion, but it does not establish participation or guilt." Id.

Likewise, in the present case we have circumstances which create a strong suspicion that Leos-Quijada was in the Taylor Mill area for the purpose of picking up drugs. However, such circumstances are not enough to establish Leos-Quijada's participation beyond a reasonable doubt. Just as the McMahon car was seen in the vicinity of the truck carrying illegal aliens, Leos-Quijada's vehicle was seen at Taylor Mill one half mile to a mile from where the drugs were found an hour or so later. The McMahon car was also observed acting suspiciously in that it twice turned around and headed the opposite direction and even stopped after the truck was stopped. Likewise, Leos-Quijada's vehicle was observed leaving the Taylor Mill area at a high rate of speed after the confidential informant arrived at the area. Finally, in the McMahon case there were circumstances linking the alleged lead car and load car: both had CB radios, the car seemed to turn around when the truck did, the truck turned around after speaking in the CB, and there was a brother-in-law relationship between the driver of the car and a passenger in the truck. In the present case, the only circumstances linking the backpackers in the desert with Leos-Quijada were his presence in the general vicinity and the fact that when law enforcement officers arrived at Taylor Mill in a sports utility vehicle of a similar color to the vehicle driven by Leos-Quijada, the man in the desert responded to the honking and whistling.

After carefully reviewing the record in this case, we conclude that a reasonable jury could not find Leos-Quijada guilty of aiding and abetting the possession of marijuana with intent to distribute beyond a reasonable doubt. Because of this disposition, we do not reach the issue of prosecutorial misconduct.

## IV. <u>Conclusion</u>

For the foregoing reasons, we REVERSE Leos-Quijada's conviction.

No. 95-2100, United States v. Leos-Quijada

McWilliams, J., concurring in part, dissenting in part.

I agree with that part of the majority opinion which holds that the district court did not err in denying the defendant's motion to suppress. I dissent from that part of the majority opinion which holds that the evidence is legally insufficient to support the jury's verdict that the defendant knowingly and intentionally aided and abetted others in possessing marijuana with an intent to distribute.

At the conclusion of the government's case, the defendant moved for a judgment of acquittal. The district court denied that motion and defense counsel rested his case, calling no witnesses. So, this is not a case that involves conflicting testimony. Rather, the question is whether the government's evidence is legally sufficient to support the jury's guilty verdict. I believe it is.

The majority opinion fairly and accurately summarizes the government's evidence. As the majority opinion states, when Agent Villa and Deputy Umphries arrived at the Taylor Mill, they "discovered footprints, which Agent Villa testified matched those of Leos-Quijada, and tire tracks which matched those of the Jeep Cherokee that Leos-Quijada was driving. Agent Villa testified that the footprints and tire tracks indicated that Leos-Quijada had been in the Jeep Cherokee which the confidential informant had seen parked at Taylor Mill and that Leos-Quijada had exited the vehicle and stood near the

vehicle . . . ." Further, as the majority opinion notes, the Taylor Mill was located in a desolate area in Southern New Mexico about 15 miles from the boundary between the United States and Mexico. So, the jury could well conclude that the defendant, Leos-Quijada, was at the so-called "scene of the crime" and was there at about 6:50 a.m!

Moments later, and not too many miles away from Taylor Mill, Leos-Quijada, driving the Jeep Cherokee, was stopped by officers. The majority opinion fully recites what occurred at that time, itemizing the conflicting and sometimes inherently improbable statements made by Leos-Quijado and his companion. The foregoing, in my view, supports the prosecutor's theory of the case, namely that Leon-Quijado and his companion had gone to the Taylor Mill area at 6:50 a.m. to pick up a load of marijuana and were scared off by the officers' confidential informant who was surveying the scene with field glasses about an eighth to a quarter mile away.

In short, the majority opinion convinces me that there is sufficient evidence to support the jury's verdict.