**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**May 30, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

       Plaintiff-Appellee,

v.

RAFAEL ISAAC-SIGALA,

       Defendant-Appellant.

No. 05-2089

---

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. CR-03-1598-RB)**

---

Scott M. Davidson, Albuquerque, New Mexico, for Defendant-Appellant.

Terri J. Abernathy, Assistant United States Attorney (David C. Iglesias, United States Attorney with her on the brief), Las Cruces, New Mexico, for Plaintiff-Appellee.

---

Before **LUCERO**, **ANDERSON**, and **TYMKOVICH**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

---

    This case asks whether a conviction for conspiring to smuggle narcotics and aiding and abetting the distribution of narcotics must be overturned when there is substantial evidence that the defendant drove a scout vehicle for a drug

smuggler but where there is only circumstantial evidence that he knew the specific contents of the smuggler's van. Because we conclude that the evidence reasonably supports the jury's conclusion that the defendant knowingly advanced the essential objectives of the conspiracy, we exercise jurisdiction under 28 U.S.C. § 1291 and **AFFIRM**.

## I

In the early morning hours of December 5, 2002, a white van hauling an empty flat bed trailer approached an immigration checkpoint near Alamagordo, New Mexico. Behind the wheel sat Mario Meija-Nunez; Pedro Aguilar-Guerra was at his side in the passenger seat. The Border Patrol Agent on duty, Mark Bazill, asked Meija-Nunez for identification, and the occupants retrieved immigration documents. While Agent Bazill reviewed the documents, Meija-Nunez volunteered that he and Aguilar-Guerra were car haulers traveling to Ruidoso, New Mexico, where they intended to pick up cars for resale in Mexico. This surprised Agent Bazill, because, during his six years on the border patrol, he had never encountered car haulers destined for Ruidoso. In his experience, car haulers usually travel to places where car auctions are held such as Denver, Kansas, and Michigan.

Agent Bazill asked for permission to search the van and Meija-Nunez assented. While examining the roof of the van, Agent Bazill noticed fresh tool marks on the screws of the center panel. Because these marks indicated recent

tampering with the roof panel, Agent Bazill suspected that the ceiling of the van was concealing narcotics. He referred the van to the secondary inspection area at the checkpoint, and the van was taken off the highway.

During the secondary inspection of the white van, Agent Bazill interviewed the two men. Meija-Nunez repeated that he and his companion were on their way to Ruidoso to collect previously purchased vehicles. When asked what vehicles they had purchased, Meija-Nunez answered "a Dodge van." Meanwhile, after dogs alerted to the smell of contraband coming from the van, two agents drilled into its ceiling and uncovered 96.4 net pounds (43 kilograms) of marijuana. Meija-Nunez and Aguilar-Guerra were placed under arrest, and their personal belongings were inventoried. A two-way hand held radio was recovered from Meija-Nunez's jacket pocket.

About ten minutes later, while the white van was in the secondary inspection area, a blue van driven by Rafael Isaac-Sigala approached the checkpoint. Another Border Patrol Agent, David Blasquez, was now monitoring the checkpoint in Agent Bazill's absence. At the time the blue van approached, Agent Bazill had not yet spoken with Agent Blasquez about the marijuana discovered in the white van. Agent Blasquez proceeded to interview Isaac-Sigala, who also stated that he was en route to Ruidoso to purchase vehicles. Like Agent Bazill, Agent Blasquez considered this small town an unusual destination for car haulers.

Noticing that the blue van displayed a temporary registration tag, Agent Blasquez asked where Isaac-Sigala worked. Isaac-Sigala responded by producing an identification card from Cereceres Auto Sales in El Paso, Texas. Agent Blasquez referred the blue van to secondary inspection, and after a canine examining the van did not alert, Isaac-Sigala drove away from the checkpoint.

Shortly after Isaac-Sigala drove away, Agent Blasquez spoke to Meija-Nunez and Aguilar-Guerra. When he learned that they were also going to Ruidoso on a car haul, Agent Blasquez radioed an agent on patrol duty that night, Agent Javier Ramirez, and asked him to intercept the blue van. Agent Ramirez discovered the blue van approximately 20 miles north of the checkpoint, traveling south, towards the checkpoint, instead of north, towards Ruidoso.

Agent Ramirez stopped the blue van, and asked Isaac-Sigala if he was headed towards Ruidoso. Isaac-Sigala replied that he was lost. Explaining that he would like to question Isaac-Sigala about a vehicle that was being held at the checkpoint, Agent Ramirez asked Isaac-Sigala for permission to search the blue van and to follow Agent Ramirez back to the checkpoint. Isaac-Sigala assented to both requests. In the course of searching the van for weapons, Agent Ramirez recovered a two-way hand held radio.

During Agent Ramirez's search of the van, another Border Patrol Agent, Julio Baray, spoke with Isaac-Sigala. Agent Baray explained that another van was being held at the immigration checkpoint and its driver had told agents that

he was heading to Ruidoso to purchase vehicles. Agent Baray then asked if Isaac-Sigala was traveling with anybody else. Isaac-Sigala stated that he was not. Agent Baray asked Isaac-Sigala specifically whether he was following the other van. Isaac-Sigala denied doing so.

Once Isaac-Sigala had been escorted back to the checkpoint, Agent Ramirez informed Agent Bazil that he had found a two-way radio inside Isaac-Sigala's van. The agents observed that the radio found in Meija-Nunez's van was the same make and model as the one recovered from Isaac-Sigala's van. After switching on the radios and speaking to one another, the agents confirmed that the radios were set to the same frequency as well. When Agent Baray showed Isaac-Sigala the white van Meija-Nunez had been driving and asked if he had been following it, Isaac-Sigala again denied traveling with any other vehicle and claimed that he did not know the driver of the white van.

Further evidence that the two vans were working together was discovered shortly thereafter. In the center console of the white van, another border patrol agent, Agent Claude Claflin, discovered a bill of sale for the blue van that Isaac-Sigala was driving. A temporary tag affixed to the trailer that the white van was towing displayed the name "Cereceres Auto Sales." An Alamagordo police officer later assigned to handle the forfeiture of both vehicles determined that Isaac-Sigala's blue van was also registered to Cereceres Auto Sales. This same officer attempted to reach Cereceres by mail, and when his notice of forfeiture

was returned, he traveled to the address on record and found no business by that name at that location.

A federal grand jury in the District of New Mexico returned a two-count indictment against Isaac-Sigala. Count 1 charged him with conspiracy to possess with intent to distribute less than 50 kilograms of marijuana, in violation of 21 U.S.C. § 841(a)(1), 21 U.S.C. § 841(b)(1)(D), and 21 U.S.C. § 846. Count 2 charged possession with intent to distribute less than 50 kilograms of marijuana, in violation of 21 U.S.C. § 841(a)(1), 21 U.S.C. § 841(b)(1)(D), and 18 U.S.C. § 2. Aguilar-Guerra and Meija-Nunez were named as co-defendants and charged with the same two counts.

Isaac-Sigala and Aguilar-Guerra proceeded to trial; Meija-Nunez remained a fugitive. At the close of trial, the jury convicted Isaac-Sigala of both counts and acquitted Aguilar-Guerra on both counts. The district court later sentenced Isaac-Sigala to concurrent 33-month sentences. Isaac-Sigala appeals.

**II**

Isaac-Sigala argues that insufficient evidence supports both his convictions for conspiracy and possession with intent to distribute. We review challenges to the sufficiency of the evidence de novo. United States v. Voss, 82 F.3d 1521, 1524-25 (10th Cir. 1996). In doing so, we consider only "whether, taking the evidence – both direct and circumstantial, together with the reasonable inferences to be drawn therefrom – in the light most favorable to the government, a

reasonable jury could find the defendant guilty beyond a reasonable doubt." Id. (quotations omitted). A conviction should be reversed only if "no reasonable juror could have reached the disputed verdict." United States v. Carter, 130 F.3d 1432, 1439 (10th Cir. 1997). "The evidence necessary to support a verdict need not conclusively exclude every other reasonable hypothesis and need not negate all possibilities except guilt. Instead, the evidence only has to reasonably support the jury's finding of guilt beyond a reasonable doubt." United States v. Wilson, 182 F.3d 737, 742 (10th Cir. 1999) (internal citations and quotations omitted). However, "[a] jury will not be allowed to engage in a degree of speculation and conjecture that renders its finding a guess or mere possibility." United States v. Jones, 49 F.3d 628, 632 (10th Cir. 1995).

**A**

To obtain a conviction for conspiracy in violation of 21 U.S.C. § 846, the government must establish beyond a reasonable doubt that: (1) there was an agreement to violate the law; (2) the defendant knew the essential objectives of the conspiracy; (3) the defendant knowingly and voluntarily took part in the conspiracy; and (4) the coconspirators were interdependent. United States v. Riggins, 15 F.3d 992, 994 (10th Cir. 1994). To establish possession under an aiding and abetting theory, the government must prove beyond a reasonable doubt that the defendant: (1) "willfully associate[d] with the criminal venture," and (2) "aid[ed] such venture through affirmative action." United States v. Delgado-

Uribe, 363 F.3d 1077, 1084 (10th Cir. 2004) (internal citations and quotations omitted). "Participation in the criminal venture may be established by circumstantial evidence and the level of participation may be of 'relatively slight moment.'" United States v. Anderson, 189 F.3d 1201, 1207 (10th Cir. 1999) (internal citation omitted) (quoting United States v. Leos-Quijada, 107 F.3d 786, 794 (10th Cir. 1997)). "The evidence that supports a conviction for conspiracy can also be used to support a conviction for aiding and abetting in the possession of illegal narcotics with intent to distribute." United States v. Carter, 130 F.3d 1432, 1441 (10th Cir. 1997) (internal citation and quotation omitted).

The government argued at trial that Isaac-Sigala conspired with Meija-Nunez to smuggle marijuana by acting as a "scout vehicle." According to Agent Bazill's testimony, a scout vehicle is a vehicle that travels in tandem with a "load vehicle," i.e., the vehicle carrying narcotics. Depending on the situation, a scout vehicle may travel either ahead of or behind the load vehicle. If the scout vehicle is traveling in front of the load vehicle, it may watch for speed traps or serve as a distraction at a checkpoint. A scout vehicle traveling behind a load vehicle may assist the load vehicle with any mechanical problem or may inform the owners of the narcotics if the load vehicle is intercepted by law enforcement. Without notification that the narcotics have been intercepted, the purchasers of the

narcotics are vulnerable to being arrested following a "controlled delivery" of the seized narcotics by undercover law enforcement.[1]

There is no doubt that Isaac-Sigala action's were consistent with a scout for a drug smuggling operation; the only question before us is whether the jury properly rejected other explanations for his behavior when it found him guilty. The following facts are especially relevant for our inquiry. When Isaac-Sigala entered the checkpoint after Meija-Nunez, he claimed he was going to Ruidoso to pick up cars. That was exactly the explanation offered by Meija-Nunez only ten minutes earlier. Yet, when Isaac-Sigala was discovered a short time later, he was traveling south, away from Ruidoso, and back toward the checkpoint. Although Isaac-Sigala then claimed he was lost, he had earlier told the agent at the checkpoint that he traveled to Ruidoso regularly to purchase vehicles. Isaac-Sigala also denied any connection to the load vehicle when he was brought back to the checkpoint, despite the facts that each van was registered to the same fictitious auto dealership, that the white van contained the bill of sale for the blue van, and that each contained identical two-way radios tuned to the same frequency.

---

[1] Agent Bazill testified that a "controlled delivery" occurs when a driver of a load vehicle is arrested and agrees to cooperate with law enforcement. Law enforcement then delivers the load vehicle as planned and arrests the individuals who arrive to take possession of the narcotics.

From these facts, a reasonable jury could have concluded that: (1) Isaac-Sigala falsely denied any connection to the load vehicle; (2) Isaac-Sigala lied to border patrol agents about the purpose and destination of the trip; (3) Isaac-Sigala and Meija-Nunez had jointly manufactured their cover story; and (4) Isaac-Sigala's conduct was consistent with that of a scout vehicle driver for a narcotics smuggling operation.

Isaac-Sigala explicitly concedes inferences (1) - (3) above. Nevertheless, he argues that the jury could not have reasonably drawn the next logical inference – that he was the driver of a scout vehicle assisting Meija-Nunez with smuggling marijuana – because the jury improperly rejected "equally plausible," innocent explanations for his conduct.[2] Isaac-Sigala is fundamentally mistaken about the proof necessary to support a conspiracy conviction for narcotics smuggling.

The principal authority Isaac-Sigala relies upon for the exculpatory effect of "equally plausible" inferences in a conspiracy charge is United States v. Jones, 49 F.3d at 632. In Jones, two defendants were charged with possession of a controlled substance with intent to distribute, and of carrying and using a firearm during a drug trafficking crime, after a highway patrol officer discovered narcotics and a firearm hidden in the trunk of their rental car. The government

---

[2] These "innocent" explanations include: Isaac-Sigala wished to "conceal the details of [his and Meija-Nunez's] car hauling business . . . because they were involved in tampering with motor vehicle identification numbers, or mis-representation of motor vehicle titles, or smuggling motor vehicles into Mexico, or laundering money via the used car dealership in El Paso . . . ."

argued that the defendants knew their rental car was carrying narcotics on the strength of a third passenger's testimony. The third passenger testified that she "saw neither a gun nor a package of any kind remotely resembling the package of crack cocaine." Rather, she merely stated that she saw the two men linger around the trunk for a short time. Id. at 631. We reversed the conviction in part because we observed that it was an "equally plausible" inference that the contraband was in the car when it was rented. We continued:

> The only reasonable inference which is logically probable on the state of the evidence is that Mr. Brown [a co-defendant] was looking for something under the dash and hood. What he was seeking, again, is pure speculation. Thus, the inference he was attempting to hide something, let alone that he was trying to hide a gun and drugs, simply does not logically flow from the established facts.

Id. (emphasis in original).

No equivalent leaps of logic are necessary to connect Isaac-Sigala to the drug trafficking in this case. By Isaac-Sigala's own concessions, he and Meija-Nunez were working together to conceal illicit behavior when they were traveling into the United States from Mexico, and each tried to conceal their true plan by repeatedly insisting that they were merely car haulers on their way to Ruidoso. The only inference the jury must draw to connect Isaac-Sigala to the narcotics trafficking is that he knew the object of his smuggling was the marijuana concealed in his co-conspirator's vehicle. Given Agent Bazill's testimony explaining how scout vehicles frequently cooperate with load vehicles to smuggle

marijuana into the United States and the manifold circumstantial evidence linking Isaac-Sigala to Meija-Nunez, we cannot say that the jury's verdict finding Isaac-Sigala knew Meija-Nunez's van concealed marijuana was outside "the bounds of reason." United States v. Ramirez, 63 F.3d 937, 945 (10th Cir. 1995) ("we will accept the jury's resolution of the evidence as long as it is within the bounds of reason"); see also United States v. Hanzlicek, 187 F.3d 1228, 1232 (10th Cir. 1999) (the "elements [of conspiracy] may be proven by direct or circumstantial evidence").

Moreover, Isaac-Sigala's multiple attempts to conceal his true purpose further supports the jury's conclusion. In a series of cases we have held that "false exculpatory statements made by a defendant are admissible to prove consciousness of guilt and unlawful intent." United States v. Tager, 481 F.2d 97, 100 (10th Cir. 1973); see also United States v. Hooks, 780 F.2d 1526, 1532 (10th Cir. 1986) ("[T]he jury could have inferred appellant's guilty knowledge [that a controlled substance was hidden in the vehicle he was driving] from the undisputed testimony that appellant gave the police a false name."). Here, Isaac-Sigala made numerous false exculpatory statements: He twice lied about where he was going and twice lied about traveling with Meija-Nunez. The jury was

clearly entitled to consider this behavior when determining whether Isaac-Sigala knew the true purpose of the smuggling operation.[3]

Isaac-Sigala also argues that under United States v. Valenzuela, 365 F.3d 892, 898 (10th Cir. 2004), "it is impermissible to infer guilt based on the lead car-load car modus operandi when the purported lead car is actually behind the load car . . . ." Valenzuela, however, establishes no such categorical proposition. In Valenzuela, a Border Patrol agent pulled over and searched a vehicle on the suspicion that it was "tandem driving" with a second vehicle. He suspected tandem driving because both vehicles were heading towards Arizona and both

---

[3] For these reasons Isaac-Sigala's citation of United States v. Austin, 786 F.2d 986 (10th Cir. 1986), for the proposition that his conviction must be reversed because the "evidence shows merely clandestine activity" is unavailing. In Austin, we reversed a conviction for conspiracy to distribute marijuana where the defendant – a ranch owner – had sold a portion of his property that was ultimately used as a landing strip by other conspirators who were smuggling marijuana from Columbia by airplane. We concluded the evidence fell short of establishing Austin knew the essential objectives of the conspiracy because his ranch had been on sale for some time, he negotiated a reasonable price with the purchasers, the buyers purchased cattle, and the buyers hired Austin's son to manage the ranch. There was no evidence that even suggested Austin knew his ranch was to be used for a landing strip, let alone, to be used to facilitate narcotics smuggling. Id. at 988-89. Although Austin began to suspect something illegal was happening on his property when he noticed airplane tracks, we held "mere suspicion is not enough" because the record "contain[ed] no evidence from which a fact finder could infer that Austin knew the focus of the conspiracy was the distribution of marijuana, rather than the distribution of other contraband, or the aiding of illegal aliens, or other equally speculative illegal conduct, or even clandestine activity that did not violate the law." Id. at 989. The record in this case, however, contains ample basis for a fact-finder to conclude that Isaac-Sigala knew the focus of the conspiracy was to smuggle the marijuana hidden in Meija-Nunez's van. Moreover, unlike the defendant in Austin, Isaac-Sigala consistently misled law enforcement.

bore Arizona plates. Holding that this behavior was "[h]ardly unusual," we affirmed the district court's grant of a motion to suppress marijuana obtained from the first stop on the basis that the arresting officers had insufficient probable cause of "tandem driving" to justify a warrantless arrest. Id. at 898. We rejected the government's theory of "tandem driving" in part because the alleged lead car was at one time preceding and at another time following the alleged load car. Id. Contrary to Isaac-Sigala's reading of the case, the issue in Valenzuela was whether a stop was reasonable; the issue was not whether a jury empowered to find facts could conclude that a co-conspirator was aware of the contents of a smuggling operation based on circumstantial evidence.

**B**

We likewise conclude the evidence was sufficient to support Isaac-Sigala's conviction for aiding and abetting possession with intent to distribute. In order to prove that a defendant aided and abetted the commission of a crime, the government must establish that the defendant willfully associated himself with the criminal venture and sought to make the venture succeed through some action of his own. United States v. Leos-Quijada, 107 F.3d 786, 794 (10th Cir. 1997) (citations omitted). As with conspiracy, "[p]articipation in the criminal venture may be established by circumstantial evidence," but unlike conspiracy, "the level of participation may be of 'relatively slight moment.'" Id. (quoting United States v. McKneely, 69 F.3d 1067, 1072 (10th Cir. 1995)). In this case, Isaac-Sigala's

participation in the smuggling operation easily surpasses the minimal requirement of participation for a "slight moment."  Moreover, the record amply supports the jury's conclusion that Isaac-Sigala took some act to facilitate the group's criminal purpose.  As such, we reject Isaac-Sigala's challenge to the aiding and abetting conviction.

### III

Because we conclude the evidence was sufficient for a rational jury to find Isaac-Sigala conspired to smuggle marijuana and that he aided and abetting the distribution of marijuana, we **AFFIRM**.