**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 13 2000**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

GREGORY D. LORSON,

Defendant-Appellant.

No. 98-5151
(D.C. No. 97-CR-135-K)
(N.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **ANDERSON**, **EBEL**, Circuit Judges, and **CROW**,[**] District Judge.

Appellant Gregory D. Lorson was convicted of multiple counts of conspiracy, mail and wire fraud, and money laundering as a result of his participation in several debt-collection schemes. He has appealed his convictions and several elements of his sentence to this court. Specifically, Appellant alleges

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[**] The Honorable Sam A. Crow, United States Senior District Judge for the District of Kansas, sitting by designation.

(1) that the evidence produced at trial was insufficient to prove the requisite criminal intent; (2) that he was improperly denied a two-level reduction for acceptance of responsibility under the United States Sentencing Guidelines; and (3) that the trial judge incorrectly calculated the amount of funds Lorson laundered in imposing a two-level sentence enhancement and failed to make the required findings under F. R. Crim. P. 32(c)(1).[1]  We exercise jurisdiction pursuant to 28 U.S.C. § 1291.  For the reasons set forth below, we find none of these arguments has merit and therefore AFFIRM his convictions and sentence.

## I. Background

This case concerns a series of frauds perpetrated by Lorson and co-defendant William Evans during 1994 and 1995.  In February of 1994, Evans was hired by Collections and Receivables Worldwide Financial ("CRW"), a company engaged in the collection of past-due debts.  At approximately the same time, CRW contracted with the Resolution Trust Corporation ("RTC") to attempt collection of a series of debts RTC owned upon taking control of several failed financial institutions.  Evans was made responsible for overseeing CRW's RTC

---

[1] The parties briefed a fourth issue to the court, but they subsequently reached a stipulated resolution on the claim.  That stipulation provides that any attempt by the government to substitute assets of Lorson for forfeiture shall reflect a deduction for the fair market value of a Bentley automobile previously seized.  (See Stipulation of Government and Defendant Lorson Regarding Substitute Money Judgment.)

portfolio, and shortly thereafter he hired Appellant to serve as a loan collector for CRW. (Tr. 2302, 2309-10.)

For the next several months, Lorson collected loans for CRW, for which Lorson received a salary and bonuses based on collections. On September 30, 1994, Evans opened a bank account at BankIV in Tulsa, Oklahoma, under the name "Phoenix Capital Fund AKA Capital Restructure Workout/Financial" (the "Phoenix account"). Throughout the fall of 1994 , Lorson and Evans deposited a number of checks intended for their employer, CRW, into the Phoenix account. Lorson and Evans then disbursed most of the proceeds of this account to themselves, while failing to report these collections to CRW and sometimes informing CRW that the debts were uncollectible and should be written off.

At trial, the government offered evidence that Lorson and Evans perpetrated fraud while employed by CRW (collectively known as the "CRW conspiracy"). In the Oak Hills-Carrollton Fraud, Lorson negotiated with the attorney of James Motley, who had guaranteed $6.1 million on an overdue note that was part of CRW's RTC portfolio. Lorson and Evans agreed to accept $5,000 from Motley on behalf of CRW in exchange for the release of some of Motley's obligations on the note. On September 29, 1994, Motley's attorney faxed Lorson settlement and release documents, and Lorson returned the papers, which Evans had signed on behalf of CRW. Motley's attorney then Federal

Expressed a $5,000 check payable to CRW Financial to Lorson at the company's Tulsa office. Several days later, Evans deposited that check in the Phoenix account, and immediately wrote himself a $2,500 check and two checks totaling $2,500 to Lorson.

In November of 1994, Lorson negotiated an additional $7,500 payment from Motley, in exchange for the transfer of the note to Motley. Motley directed that the funds be wired to CRW, but Evans arranged for the money to go to his personal account at BankIV. On the same day Evans received the funds, November 29, 1994, he transferred $3,750 to the Phoenix account. Lorson, now a signatory on the Phoenix account, wrote himself checks for $1,750 on November 29 and for $2,000 on December 13.

The record supports the conclusion that neither Evans nor Lorson was authorized by CRW to complete these transactions, nor were they authorized to divert any collected funds to the Phoenix account. In fact, Lorson apparently recommended to CRW (with the approval of Evans) that the company write off the loan as uncollectible, and the company did so on September 27, 1994–some two months before Lorson and Evans had negotiated the second payment from, and transfer of the note to, Motley.

In the Bell Fraud, Lorson negotiated with the attorney of Leah Bell for the release of several debts within the RTC portfolio. On October 11, 1994, Bell's

attorney sent a check for $ 19,989.39, payable to CRW Financial, to Lorson at CRW's Tulsa office. The next day, however, the check was deposited in the Phoenix account. Evans then wrote Lorson a check from the Phoenix account for $9,500, which Lorson cashed the next day. In the next several days, Evans cashed two Phoenix checks totaling $9,995.

In the Bateman & Slade Fraud, Lorson negotiated with a representative of that firm for the release of an RTC debt held by CRW. Upon Lorson's receipt of a check for $12,500, payable to CRW Financial, Inc., the funds were deposited into the Phoenix account. In the following days, Evans cashed a Phoenix check for $6,250 and Lorson cashed three checks totaling $5,500.

In the Mola Development Fraud, Lorson assisted in the negotiation of a series of payments totaling $85,000 in purported satisfaction of an RTC debt owed by Mola Development. Two $10,000 checks payable to CRW Financial were deposited in the Phoenix account, as well as a $65,000 wire transfer. As the funds came into the account, Lorson made a series of cash withdrawals and both Lorson and Evans cashed several checks on the account.

In the Green Fraud, Lorson received a cashier's check from Betty Green for $1,489, payable to "CRW in care of Greg Larson [sic]." Green's payment was in satisfaction of an outstanding loan in CRW's RTC portfolio. Lorson deposited the check directly into his brother's bank account on November 10, 1994.

In the Norris Fraud, Lorson deposited a check from Don Norris, which Evans had received in exchange for his signing a release of Norris' obligation on behalf of CRW. On December 9, 1994, Lorson deposited the $15,000 check into the Phoenix account and received $1,000 in cash. The next day, Lorson wrote a Phoenix check for $7,084, with which he purchased a cashier's check.

During roughly the same period, Lorson and Evans also defrauded California investors Philip Aronoff and Louise Tessem of $25,000. As part of the "Aronoff conspiracy," Lorson and Evans induced Aronoff and Tessem to ostensibly join in the purchase of the Oakhill-Carrollton note–the very same note Lorson and Evans were negotiating to transfer to James Motley. Lorson and Evans told the investors that one of their clients, Phoenix Capital Fund, would contribute $200,000, and that Lorson and Evans would themselves contribute $25,000 toward purchase of the note. In fact, no contributions were made by anyone other than Aronoff and Tessem. Evans used Aronoff's check for $25,000 to open the Phoenix account. Under CRW's agreement with RTC, Evans and Lorson were not authorized to transfer the Oakhill-Carrollton note to a third party.

On November 1, 1994, Evans and Lorson formed AmeriWest Bancorp, Inc. ("AmeriWest") with Aronoff and Tessem, setting up branches in California and Oklahoma. The stated purpose of incorporating AmeriWest was to collect on the

Oakhill-Carrollton note. Aronoff dissolved the California branch of AmeriWest, but Lorson and Evans continued to operate as AmeriWest in Oklahoma. Acting as AmeriWest, Lorson and Evans contracted with Chilmark Financial Company ("Chilmark") to collect a pool of debts held by Chilmark. The funds AmeriWest collected were to be deposited in an escrow account, less a collection fee of 25% for collections not requiring legal action and 35% for collections involving such action. An additional 5% was due AmeriWest on collections over and above a set amount. Chilmark's Ned Grier discussed these arrangements with Lorson, and Lorson signed each of the contracts with Chilmark on behalf of AmeriWest. For most of 1995, however, Lorson and Evans engaged in the "Chilmark conspiracy" by failing to report or underreporting their collections to Chilmark. In total, AmeriWest withheld more than $375,000 that was due under the terms of the contract, while disbursing more than $300,000 to Lorson for his personal use and for "vehicles." Lorson reviewed the monthly reports prepared by Evans before forwarding them to Grier at Chilmark. At trial, a former AmeriWest employee testified that he saw Lorson receive a fax from Evans asking "how the numbers should be massaged in the 1995 reporting to the client on collections."

At a jury trial, Lorson was convicted of three counts of conspiracy to commit mail fraud and wire fraud, eight counts of mail fraud and aiding and abetting, four counts of wire fraud and aiding and abetting, one count of money

laundering and aiding and abetting, and one additional count of money laundering. Lorson received a two-level enhancement on the money laundering sentence under U.S.S.G. §2S1.2, because the laundered funds were determined to be more than $200,000 but less than $350,000. Lorson was denied a two-point reduction under U.S.S.G. §3E1.1 for acceptance of responsibility. He was sentenced to 70 months' imprisonment, all sentences running concurrently.

## II. Discussion

A. Sufficiency of the Evidence

Although he admits to all the conduct alleged and proved at trial, Appellant contends that the evidence of his criminal intent was insufficient to support the jury's guilty verdicts.

> In making this argument, the defendant[] [is] faced with a high hurdle: in reviewing the sufficiency of the evidence to support a jury verdict, this court must review the record de novo and ask only whether, taking the evidence–both direct and circumstantial, together with the reasonable inferences to be drawn therefrom–in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt.

United States v. Voss, 82 F.3d 1521, 1524-25 (10th Cir. 1996) (quotation omitted). Moreover, "[w]e do not use this evaluation as a chance to second-guess the jury's credibility determinations, nor do we reassess the jury's conclusions about the weight of the evidence presented." United States v. Yoakam, 116 F.3d 1346, 1349 (10th Cir. 1997) (quotation omitted). Still, "[t]he evidence supporting

a jury's verdict must be substantial, . . . raising more than a mere suspicion of guilt. Although the jury may draw reasonable inferences from direct and circumstantial evidence, such inferences must be more than speculation and conjecture in order to be reasonable." Id. (citation omitted).

It is not disputed that conspiracy, mail fraud, wire fraud, and money laundering all require intent as an element of the offense. See United States v. Pretty, 98 F.3d 1213, 1218 (10th Cir. 1996) (listing elements of conspiracy); United States v. Smith, 133 F.3d 737, 742-43 (10th Cir. 1997) (listing elements of mail fraud and wire fraud); United States v. Massey, 48 F.3d 1560, 1565 (10th Cir. 1995) (listing elements of money laundering). Furthermore, it is likewise settled that a jury may infer criminal intent from proved conduct and surrounding circumstances. See Pretty, 98 F.3d at 1218 ("Circumstantial evidence is sufficient to prove a conspiracy."); Smith, 133 F.3d at 743 ("Intent may be inferred from a variety of circumstantial evidence . . . .). Our inquiry, therefore, is to examine whether the evidence offered at trial would allow a reasonable jury to infer that Lorson acted with fraudulent intent.

Under our standard of review, it is beyond question that the jury had sufficient evidence of Lorson's intent. At trial, the government presented a plethora of circumstantial evidence that Lorson acted with the requisite criminal intent. In regard to the Oak Hills-Carrollton note, Lorson negotiated the release

of Mr. Motley's personal liability, pocketed half of the $5,000 payment, but then recommended to CRW that the debt be written off as uncollectible. During the same time period, Lorson was also negotiating the sale of the same note to Mr. Aronoff. The government also presented evidence that Lorson collected a cashier's check from Ms. Betty Green in partial satisfaction of a debt assigned to CRW by RTC. Instead of forwarding this payment to his employer, however, Lorson simply deposited the check for $1,489 into his brother's bank account. The government introduced significant evidence of similar transactions establishing four additional instances of Lorson's involvement in defrauding CRW of sums collected on its behalf. One government exhibit tracked funds in the Phoenix account, and showed that from September 30 to December 31, 1994, $85,143 was disbursed to Evans, $63,058 to Lorson, and $16,602 for other expenses. All but one of the deposits made to the Phoenix account can be traced to funds collected by Evans and Lorson on behalf of CRW. Thus, the jury reached the reasonable conclusion that Lorson intended to defraud CRW.

With regard to the Aronoff conspiracy, the government presented overwhelming circumstantial evidence that Lorson was aware that the sale of the note to Aronoff was fraudulent. First, it was Lorson who negotiated the second agreement with Motley, while at roughly the same time faxing several documents to Aronoff purporting to establish the legitimacy of the sale to Aronoff. Second,

after receiving Aronoff's $25,000 cashier's check, Lorson faxed Aronoff an assignment of the note to the latter's company, along with a letter outlining the agreement among Evans, Lorson, Aronoff, and Phoenix Capital. That letter, signed by Lorson and Evans, indicated that "'Phoenix is in receipt and acknowledges hereby the payment of $25,000.00 paid by Mr. Lorson and Mr. Evans.'" Lorson and Evans made no such payment to any entity. The circumstantial evidence of this conspiracy is compelling, and a reasonable jury could certainly have convicted Lorson.

Lorson's intent with regard to the Chilmark conspiracy was also established at trial. The government presented evidence that Lorson substantively reviewed the files before he personally forwarded them to Chilmark. Moreover, one witness testified that he saw Lorson receive a fax from Evans asking "how the numbers should be massaged in the 1995 reporting to the client on collections." The government also introduced financial records showing that in 1995 AmeriWest disbursed $308,954 to Lorson for personal use or for "vehicles," while remitting to Chilmark $375,392 less than arguably was due under the contract. In sum, it was perfectly reasonable for the jury to conclude that Lorson intentionally participated in the Chilmark conspiracy.

There was also sufficient evidence to support the jury's convictions for mail fraud, wire fraud, and money laundering. It is not disputed that Lorson used

the telephone (including facsimiles) and interstate mail services to accomplish his schemes. Moreover, it is not disputed that funds collected pursuant to the CRW and Aronoff Conspiracies were channeled into the Phoenix account and then disbursed to Lorson and Evans. It was entirely reasonable for the jury to draw the very same inferences of criminal intent from the conduct proved at trial (and admitted on appeal) in regard to the mail fraud, wire fraud, and money laundering counts. These convictions were supported by the evidence and therefore proper.

In summary, as to each count against Lorson there was adequate evidence to support an inference of criminal intent to commit the crime charged.

B. Calculation of Laundered Funds

On appeal, Lorson contends that the district court erred in imposing a two-level enhancement to his money laundering sentence. The United States Sentencing Guidelines, under which Lorson was sentenced, provide for such an enhancement when the value of the laundered funds exceeds $200,000, but is less than $350,000. See U.S.S.G. §2S1.1(b)(2)(C). Lorson challenges this enhancement on two grounds.

His first claim is that the district court violated Fed. R. Crim. P. 32(c)(1) by simply adopting the presentence report ("PSR") instead of making its own findings and ruling on Lorson's objections. Rule 32(c)(1) states in part: "For each matter controverted [at the sentencing hearing], the court must make either a

finding on the allegation or a determination that no finding is necessary because the controverted matter will not be taken into account in, or will not affect, sentencing." Lorson failed to raise a 32(c)(1) objection below, however, which restricts this court to reviewing for plain, or "obvious and substantial" error. See United States v. Brown, 164 F.3d 518, 522 (10th Cir. 1998); United States v. Barber, 39 F.3d 285, 288 (10th Cir. 1994) ("To constitute plain error the district court's error must have been both obvious and substantial.") (quotation omitted). "And because we have already held the failure to make specific findings under Rule 32(c)(1) does not rise to the level of obvious and substantial error, we need not proceed any further on this issue." Brown, 164 F.3d at 522 (citing United States v. Williamson, 53 F.3d 1500, 1527 (10th Cir. 1995)). Thus, Lorson's Rule 32(c)(1) claim must be denied.

Lorson's second objection to this sentencing enhancement is that "the PSR figure of $259,319 in laundered funds cannot be based on simply deposits into the AmeriWest account." Appellant appears to suggest that the fraud used to procure some of these funds and the deposits into the AmeriWest account to support separate enhancement of the money laundering sentence were all one event such that a separate conviction for money laundering could not be maintained. Cf. United States v. Johnson, 971 F.2d 562 (10th Cir. 1992) (holding that where the fraud consisted of inducing investor to wire funds to defendant's account, that

transaction alone cannot also support money laundering charge). This argument, however, was not raised below. Lorson's only objection below to the amount of laundered funds for purposes of sentencing enhancement was that he should have received credit for additional monies legitimately collected on behalf of Chilmark and that he was not responsible for certain collections undertaken solely by Evans. An argument presented for the first time on appeal may only be reviewed for plain error.

> Under Fed. R. Crim. Pro. 52(b), in order for
>
> an appellate court [to] correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affects substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error , but only if (4) the error seriously affects the fairness, integrity, or public reputation of the judicial proceedings.

Johnson v. United States, 520 U.S. 461, 466-67 (1997) (quotations and alterations omitted). The record in the present case does not indicate that the district court committed a plain error by finding the amount of laundered funds to be $259,319. As the PSR sets out in detail, a total of $367,563.90 moved through the AmeriWest account that was due to Chilmark. After subtracting some $105,000 for which Lorson was deemed not to be responsible, the total funds which Lorson helped launder through the AmeriWest account was $259,319. Moreover, the fraud through which Lorson procured these funds involved conduct other than transfer of the funds into the account, such as the failure to report collections to

- 14 -

Chilmark as required by the contracts. As a result, Lorson's objection to the court's two-level enhancement fails.

C. Acceptance of Responsibility

Finally, Lorson asserts that the district court erred in denying him a two-level reduction for acceptance of responsibility ("AOR") under U.S.S.G. §3E1.1. Specifically, Lorson maintains the district court believed that it was legally prohibited from granting such a reduction because Lorson made the government prove its case at trial. "We review the district court's legal interpretation of the guidelines de novo and review its findings of fact for clear error, giving due deference to the district court's application of the guidelines to the facts." United States v. Janusz, 135 F.3d 1319, 1324 (10th Cir. 1998).

The record clearly indicates that the district court did not rule as a matter of law that Lorson was ineligible for the AOR reduction simply because he went to trial. At sentencing, the district court denied Lorson's request for the reduction, stating that "[t]he defendant went to trial, proclaimed his innocence, but was found guilty and still denies guilt in his objections to the presentence investigation report, and there has not yet been any acceptance of responsibility of the crimes." After the court had ruled on all the objections, Lorson addressed the court and identified his efforts at accepting responsibility. The court then responded: "I think you did make some efforts of acceptance of responsibility, but

- 15 -

it's awfully difficult for [sic] the Tenth Circuit to go to trial and get credit for that." The court merely noted that it was difficult, not impossible, to go to trial and receive the AOR reduction. Under a plain interpretation of this language, we cannot conclude that the district court ruled as a matter of law that the AOR reduction was not available because Lorson went to trial.

"A district court's decision regarding whether a defendant has accepted responsibility for purposes of § 3E1.1 is a factual determination we review only for clear error." United States v. Hill, 197 F.3d 436, 446 (10th Cir. 1999). Ordinarily, "[t]he adjustment provided by § 3E1.1 is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." Id. (quotation and alterations omitted).

> Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.

Id. (quotation omitted) (citing U.S.S.G. §3E1.1, comment (n.2)). In the present case, Lorson has always (and continues even on appeal) denied a crucial element of the offenses with which he was charged, namely the existence of fraudulent

intent. In <u>Hill</u>, this court specifically held that it was not clear error for a district court to deny the AOR reduction where the defendant disputed his fraudulent intent at trial. <u>See</u> <u>id.</u> Nor was it clear error in the present case to deny Lorson this reduction when he consistently denies criminal wrongdoing.

### III. Conclusion

In sum, the jury was able to infer Lorson's criminal intent from the direct and circumstantial evidence the government presented at trial. Moreover, the district court properly imposed a two-level enhancement of Lorson's money laundering sentence and did not clearly err by denying him the AOR reduction. As a result, we AFFIRM the verdicts and sentences imposed below.

ENTERED FOR THE COURT

David M. Ebel
Circuit Judge