F I L E D
United States Court of Appeals
Tenth Circuit

JUN 27 1997

PATRICK FISHER
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

vs.

TERRY G. YOAKAM,

     Defendant - Appellant.

Nos. 96-3207
96-3292

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 95-20023)

Robert V. Eye (Pedro L. Irigonegaray and Melissa A. Kelly, with him on the brief),
Irigonegaray & Associates, Topeka, Kan., for Defendant-Appellant.

Leon J. Patton, Assistant United States Attorney (Jackie N. Williams, United States
Attorney, with him on the brief), Office of the United States Attorney, Kansas City, Kan.,
for Plaintiff-Appellee.

Before SEYMOUR, Chief Judge, LOGAN and KELLY, Circuit Judges.

KELLY, Circuit Judge.

     More than two years after a fire destroyed Tholen's Supply Company, Terry

Yoakam, a shareholder and the operator of the business, was indicted on eight counts of

arson, mail fraud, and wire fraud, in violation of 18 U.S.C. §§ 844(h)(1), 1341, and 1343. Mr. Yoakam was tried before a jury and convicted on all counts. After the jury returned its verdict, Mr. Yoakam filed a motion for acquittal, which the district court denied. Mr. Yoakam now appeals his conviction on three grounds, including that the district court abused its discretion in not granting a new trial based on a claim of patently incredible evidence. We exercise jurisdiction under 28 U.S.C. § 1291, and reverse. Given our resolution, we need not address Mr. Yoakam's other two grounds for appeal.

Background

Mr. Yoakam and his wife owned twenty-five percent of Tholen Supply Company (Tholen's) in Leavenworth, Kansas. The remainder of the business was owned by three other couples, including Mr. Yoakam's in-laws. The shareholders had purchased the business in 1982 with the understanding that, at some undetermined point in the future, Mr. and Mrs. Yoakam might buy out the others and become sole owners of Tholen's.

In 1990, Mr. Yoakam began what became protracted negotiations to buy out the other shareholders. Mr. Yoakam's in-laws agreed to give their shares to Mr. and Mrs. Yoakam in return for life insurance policies paid for by Tholen's. The Yoakams agreed to purchase the remainder of the company from the other shareholders for $400,000. The Yoakams had completed the necessary paperwork for a Small Business Administration loan in the amount of $450,000, and were to attend a meeting of the shareholders on the

night of September 22, 1992, to finalize the terms of the agreement. That very evening, however, Tholen's burned to the ground.

On that evening, Mr. Yoakam, three employees, and one customer were in the building until approximately 5:03 p.m. Two minutes later, Mr. Yoakam left, the last person known to have been in the building before the fire was reported. Approximately seven minutes later, someone from a nearby office saw smoke at Tholen's and called 911. Firefighters arrived within a few minutes, but by then—approximately fifteen minutes after everyone left—the building was totally engulfed in flames. The firefighters determined that the building could not be saved, and merely contained the fire from the outside to prevent it from spreading to nearby buildings.

On March 10, 1995, Mr. Yoakam was indicted on eight counts of arson, wire fraud, and mail fraud. Counts 1 and 2 charged Mr. Yoakam with setting fire to Tholen's for the purposes of committing mail fraud. Counts 3, 4, 5 and 6 charged Mr. Yoakam with using the mail to fraudulently obtain insurance proceeds resulting from the fire. Counts 7 and 8 charged Mr. Yoakam with using interstate wire communications (i.e., a fax machine) to fraudulently obtain insurance proceeds resulting from the fire.

The government's theory at trial was that Mr. Yoakam set the fire in order to avoid entering an unfavorable business transaction—the acquisition of full ownership of Tholen's. The government sought to prove that the fire was the result of arson, and that Mr. Yoakam had the opportunity to set the fire because he was the last person to leave.

The government also presented evidence showing that Tholen's was having financial difficulties, and that Mr. Yoakam had agreed to pay $400,000 to acquire half of the business, which was not worth $800,000, but only $474,665.

The government called three fire experts, one of whom was the investigator for Tholen's insurance company. All three experts opined that the fire was caused by arson. The investigators testified that they saw evidence of a liquid accelerant poured in two different places. The investigators also based their arson finding on the fact that an unburned trail of computer paper was spread around the office area of the building, presumably to accelerate the blaze.

The government also called a government financial auditor who testified that Tholen's was under financial stress. He based this conclusion upon his review of Tholen's financial records, and presented some financial data at trial. For example, the auditor calculated Tholen's net worth of $474, 665 from the most current financial statements. The auditor also testified that Tholen's gross sales declined from $2.4 million in 1984 to $1.2 million in 1990, and that the company had averaged only $7,200 in net profit from 1986 to 1992. He further testified that assets shrunk from $1.3 million in 1984 to $804,000 in 1991, and that in the accounting year before the fire, monthly sales were down twenty-five percent from the previous year.

The government's auditor also testified regarding Tholen's liquidity problems. It had been late on its bank loan payments eight times before the fire, and overdue payroll

tax deposits in 1992 resulted in $2,000 in late fees. The auditor also testified that Tholen's checking account was overdrawn 43 times from September 1991 to August 1992, resulting in $900 in overdraft charges.

In response to the government's evidence, Mr. Yoakam testified on his own behalf and denied having set Tholen's on fire. He also called Patrick McGinley, a fire expert, who opined at trial that the fire was of accidental origin. Mr. McGinley's theory was that the fire had smoldered in the ceiling for days before finally erupting shortly after everyone left the building on September 22. In his opinion, the fire originated near an air conditioning unit in the ceiling as the result of a power outage a few days earlier. Mr. McGinley's theory was supported by two witnesses who smelled smoke and burning tar outside Tholen's earlier in the day, and by testimony of the firefighters on the scene, who saw the fire at the ceiling level. Mr. McGinley further countered the government fire experts by asserting that the computer paper could have been blown from the top of file cabinets to its resting place by the circular patterns sprayed from fire hoses.

Mr. Yoakam denied the government's contention that he had obligated himself to pay an inflated price to acquire complete ownership of Tholen's. He testified that, even on the evening of the scheduled meeting to finalize the terms of the sale, he was under no obligation to complete the acquisition; this testimony was corroborated by one of the other shareholders. Mr. Yoakam agreed that Tholen's financial statements showed that

assets exceeded liabilities by only $474,665, but explained that he disagreed with the government auditor's dire assessment of Tholen's financial condition.

Mr. Yoakam acknowledged that Tholen's faced liquidity problems, and that he had taken some steps to improve the company's liquidity by laying off three employees—including Mrs. Yoakam—and cutting his own salary from $42,720 to $33,000 in 1990. He and the other shareholders testified that Tholen's financial difficulties were tied to the Leavenworth economy, which had been depressed, and that they anticipated a rebound in the economy and subsequent increases in sales. Mr. Yoakam also elicited testimony from government witnesses that, despite late payments and a negative cash balance in late 1991 and 1992, Tholen's always covered its payroll and other liabilities, and had reduced its debt from $836,964 in 1984 to $283,204 in 1992. Despite Tholen's decline in sales, its gross profit on sales was constant, and even improved, from 1983 to 1992. Mr. Yoakam also called a bank officer who testified that, although Tholen's made eight late payments, the loan was never in jeopardy of being called.

At the close of the government's evidence and again at the close of all the evidence, Mr. Yoakam moved for judgment of acquittal, which was denied. After the jury returned a verdict of guilty on all counts, Mr. Yoakam again filed a motion for judgment of acquittal or for a new trial, which was again denied. The court sentenced

Mr. Yoakam to 101 months of imprisonment, and ordered him to make restitution in the amount of $142,923.32.

## Discussion

### I. Sufficiency of the Evidence

Mr. Yoakam challenges his conviction on the ground that the evidence supporting his conviction was "patently incredible." We agree with the government, however, that Mr. Yoakam's appeal is nothing more than a challenge to the sufficiency of the evidence. Thus, we must determine whether any rational jury could have found Mr. Yoakam guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). In reviewing such a challenge, we view the totality of the evidence in the light most favorable to the prosecution. Id. at 319.

"We do not use this evaluation as a chance to second-guess the jury's credibility determinations, nor do we reassess the jury's conclusions about the weight of the evidence presented." United States v. Johnson, 57 F.3d 968, 970-71 (10th Cir. 1995). Rather, we "must 'accept the jury's resolution of the evidence as long as it is within the bounds of reason.'" Messer v. Roberts, 74 F.3d 1009, 1013 (10th Cir. 1996) (quoting Grubbs v. Hannigan, 982 F.2d 1483, 1487 (10th Cir. 1993)). The evidence supporting a jury's verdict must be substantial, though, raising more than a mere suspicion of guilt. United States v. Leos-Quijada, 107 F.3d 786, 794 (10th Cir. 1997). Although the jury

may draw reasonable inferences from direct and circumstantial evidence, such inferences must be more than speculation and conjecture in order to be reasonable. Id.

Mr. Yoakam contends that the government's evidence does not support a finding that the fire was caused by arson. The government called several witnesses who testified, based on the presence of accelerants, that the fire was the result of arson. Despite the contrary evidence regarding the cause of the fire presented by Mr. Yoakam, it is exclusively the province of the jury to resolve conflicting evidence. Messer, 74 F.3d at 1013. Sufficient evidence supported a finding by the jury that the fire was caused by arson.

While there was sufficient evidence that the fire was caused by arson, the evidence presented by the government was insufficient to support a conclusion that Mr. Yoakam was the person who committed that arson. The government's theory of the case was that Mr. Yoakam's motivation for setting the blaze was avoidance of the liabilities he was about to assume by acquiring complete ownership of Tholen's, a business which was struggling financially. We have scoured the record on appeal, and have found no evidence to support the government's contention that Mr. Yoakam was pressured into this financial arrangement. Although the shareholders had entered the venture with the understanding that the Yoakams might one day buy out the other shareholders, the record does not contain even a suggestion that the Yoakams were at any time under an obligation—legal or moral—to do so. Mr. Yoakam testified that he was eager to

complete the transaction, and that he did so believing that he was making a good investment. Mr. Yoakam's testimony that he was under no obligation to buy out the other shareholders was corroborated by another shareholder, and no evidence controverts that testimony. Furthermore, the government's theory is contradicted by testimony that Mr. Yoakam thought the purchase was a good business decision and that he continuously pressed to conclude the transaction. Although a meeting was scheduled to finalize the transaction on the evening of the fire, no evidence was presented at trial to show that Mr. Yoakam could not have backed out of the deal—without consequence—that same night.

The mere fact that Mr. Yoakam had entered into a preliminary agreement to acquire complete ownership of Tholen's at a price higher than what the government's auditor would have paid based only upon a review of Tholen's financial statements is not sufficient proof of motive to burn that business down. Moreover, the government's financial auditor admitted on cross-examination that Tholen's was a going concern and that its profitability—or lack thereof—was not a source of financial motivation for Mr. Yoakam to commit arson. Because neither direct nor circumstantial evidence supports the government's theory that Mr. Yoakam was motivated to commit arson by pressure to enter into an unfavorable business arrangement, we must conclude that a conviction upon such a theory could only have been the product of speculation and conjecture. A conviction upon such a foundation cannot stand. Leos-Quijada, 107 F.3d at 794.

Even if the government had offered sufficient evidence that Mr. Yoakam had a motivation to burn down Tholen's, we would be reluctant to conclude that Mr. Yoakam was properly convicted of arson absent more persuasive evidence linking him to the fire. Although the government offered several witnesses who opined that the cause of the fire was arson, it did little to connect Mr. Yoakam to that arson. Witnesses for the government testified that the fire was started in various places with accelerants, but nothing in the record beyond Mr. Yoakam's mere presence suggested that he spread those accelerants. Several eyewitnesses, including police and fire investigators, testified that they smelled no accelerant such as gasoline or kerosene on Mr. Yoakam. The only physical evidence tying Mr. Yoakam to the arson was the fact that, on the day of the fire, he was the last one out of the building, just moments behind his employees. In our view, mere presence cannot establish beyond a reasonable doubt that Mr. Yoakam committed the arson. Leos-Quijada, 107 F.3d at 796 ("Mere presence . . . may create suspicion, but it does not establish participation or guilt.") (quoting United States v. McMahon, 562 F.2d 1192, 1196 (10th Cir. 1977)); see also State v. Howes, 432 A.2d 419, 425 (Me. 1981) (holding, under the Jackson sufficiency standard, that mere presence was insufficient to support conviction for arson). Although the jury is free to draw inferences from circumstantial evidence, those inferences must be more than mere speculation and conjecture in order to be reasonable. Leos-Quijada, 107 F.3d at 794.

In this case, we find that the evidence presented to the jury was insufficient for it to have reasonably inferred that Mr. Yoakam committed arson. Because the arson conviction cannot be sustained, the mail and wire fraud counts also cannot stand.

## II. Due Process

Mr. Yoakam's sixteen-day trial spanned 56 days, from January 16, 1996 to March 14, 1996. The court recessed on January 18 and 19 due to weather conditions, and again on January 24 and 25 to accommodate the prosecutor. From February 6 to March 6, the case was again interrupted by a recess to accommodate the travel plans of some of the jurors. Mr. Yoakam does not raise this issue as grounds for an appeal, however, we note that such a delay could rise to the level of a due process violation, if the delay is long enough that the defendant's case cannot be coherently presented. Defense counsel was obviously trying to avoid inconveniencing the jurors, whose travel plans may have been ruined without the month-long recess. However, defense counsel's responsibility is not to the jury, but to his client; the defense should not accommodate a jury's wishes to the point that the defendant's case may be prejudiced.

REVERSED.