# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

—————

No. 02-2302

—————

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Missouri |
| Christopher Schnapp, | * | |
| | * | |
| Appellant. | * | |

—————

Submitted:  November 5, 2002

Filed:  March 13, 2003

—————

Before McMILLIAN and SMITH, Circuit Judges, and LONGSTAFF,[1]
   District Judge.

—————

McMILLIAN, Circuit Judge.

Christopher Schnapp ("defendant") appeals from a final judgment entered in the United States District Court[2] for the Eastern District of Missouri upon a jury verdict finding him guilty of one count of arson in violation of 18 U.S.C. § 844(i).

——————————————

[1]The Honorable Ronald E. Longstaff, United States District Judge for the Southern District of Iowa, sitting by designation.

[2]The Honorable Charles A. Shaw, United States District Judge for the Eastern District of Missouri.

United States v. Schnapp, No. 4:00CR583 (May 14, 2002 E.D. Mo.). For reversal, defendant argues that the district court (1) abused its discretion in disallowing his testimony regarding a prior inconsistent statement allegedly made by one of the government's witnesses and (2) erred in denying his motion for judgment of acquittal on grounds of insufficiency of the evidence. For the reasons discussed below, we affirm the judgment of the district court.

Jurisdiction was proper in the district court based upon 18 U.S.C. § 3231. Jurisdiction is proper in this court based upon 28 U.S.C. § 1291. The notice of appeal was timely filed pursuant to Fed. R. App. P. 4(b).

## Background

Defendant was indicted on December 21, 2000, on one count of arson. His trial commenced on July 3, 2001. The following is a summary of the government's theory of the facts as presented to the jury. See Brief for Appellee at 2-11.

On April 9, 1998, at approximately 11 p.m., a fire broke out at the St. Clair One-Stop Convenience Store ("the One Stop" or "the store"), which was owned by defendant's parents and operated by defendant and his wife. A local law enforcement officer, Travis Blankenship, noticed smoke billowing from the One Stop building and radioed the dispatcher. Fire and police personnel responded within a few minutes after Blankenship's call.

Defendant and an employee of the One Stop, Brandy Hartman (hereinafter "Brandy"), had just left the store when Blankenship radioed the dispatcher about the fire. According to Brandy, just before they left, defendant said he had forgotten his jacket and went back into the store to retrieve it while she waited at the door. He was gone for about a minute. When he returned, he set the security alarm, and they departed. Earlier that day, Brandy had left the store because her mother had had a

medical emergency and had been hospitalized. When Brandy left to see her mother, defendant told her that she could take the rest of the day off, but she voluntarily returned later in the day. Both she and defendant are cigarette smokers and had been smoking at the store on the day of the fire. However, Brandy testified that defendant had a policy of not allowing ashtrays to be dumped into trash bags within the last half hour of the work day and she believed that the policy had been followed on the day of the fire.

Around the time Blankenship was radioing the dispatcher, the security company monitoring the One Stop's alarm system detected motion within the building and notified defendant. The security system registered the time that defendant set the alarm as 11:02 p.m. and the time that the motion detector was activated as 11:06 p.m. Defendant immediately returned to the store, where he met a police officer, Officer Calhoun, who had responded to the radio dispatch. Calhoun examined the building from the outside and observed no signs of forced entry. He obtained keys to the building from defendant and gave the keys to the firefighters who had arrived on the scene. The fire was extinguished at approximately 12:16 a.m. Afterward, defendant, accompanied by Calhoun, was permitted to enter the store, where he recovered some cash, lottery tickets, and a gun.

Laclede Gas had shut off the gas to the One Stop building while the fire was being put out, and an employee of Missouri Gas subsequently checked the lines and determined that gas was not a cause of, or contributor to, the fire. Jim Schuhmacher, an investigator with the Franklin County prosecuting attorney's office, had been called to the scene shortly after the fire started. He entered the One Stop building on several occasions after the fire. Based upon his inspections of the building and interviews of defendant and Brandy, he concluded that the fire was not ignited by natural gas coming from the furnace, smouldering cigarette butts in the trash, a faulty gas line, the electrical systems, flammable liquids spilled or poured on the floor, or any other accidental cause. He testified that, in his opinion, "the fire's origin was the

furnace storage room area located at floor level and was deliberately introduced by a human being." Brief for Appellee at 5.

Bill Buxton, a part owner of a firm called Pyr-Tech, Inc. ("Pyr-Tech"), was hired to conduct a fire cause-and-origin investigation by the company that had insured the One Stop building, Secura Insurance Co. ("Secura"). Giving reasons similar to Schuhmacher's, Buxton testified that, in his opinion, the fire had been deliberately set using ordinary combustible items such as cardboard boxes, beer cases, and paper bags at floor level. Id. at 6. Lloyd Brown, an electrical engineer hired by Buxton to examine the electrical systems, testified that the fire did not appear to have started in the furnace, nor was it ignited by an electrical source. Id. at 7-8.

At the time of the fire, the One Stop was having financial difficulties. A tax collector for the Missouri Department of Revenue, Barbara Mueller, testified that, as of April 8, 1998, the day before the fire, One Suzy-Q, d/b/a St. Clair One-Stop, was delinquent on taxes by approximately $30,000 and was on the verge of having its business license revoked. Defendant paid approximately $10,000 on April 8, 1998, but needed to pay another $3,700 by April 10, 1998, to avoid revocation. The One Stop had, in the past, received 23 notices of imminent revocation of its business license, but its license had never actually been revoked because defendant had always paid on time. A senior auditor with the Bureau of Alcohol, Tobacco, and Firearms, John Sarson, testified that, at the time of the fire, the One Stop was heavily in debt, operating at a loss, regularly relying on check overdrafting to stay in business, and had a negative balance in its bank accounts. Gary Railing, the agent with Secura who had issued the policy for the One Stop, testified that the building was insured for $240,000, the inventory and actual loss of business income were insured for $150,000, and other miscellaneous coverage added up to $30,000. Railing and other individuals associated with suppliers for the One Stop testified about the store's indebtedness and shortage of funds. Finally, an inspector with the Missouri Department of Natural Resources, Jeanine Hoeft, testified that, on April 9, 1998, she

had inspected the gas storage tanks at the One Stop, and they were not yet in compliance with gas storage tank upgrade requirements which were to become mandatory on December 22, 1998. According to Hoeft, she measured the gas levels in the two storage tanks at the One Stop on April 28, 1998, and found them to be virtually empty.

In sum, according to the government's theory of the case, defendant deliberately set the fire at the One Stop as a desperate attempt to get the business out of its dire financial circumstances.

The defense cross-examined the government's witnesses. Schuhmacher, on cross-examination, admitted that, on or about April 10, 1998, he removed a fluorescent light fixture and a junction box from the ceiling of the furnace room of the One Stop building. He testified, however, that he could not remember why he had done so. Schuhmacher also admitted that, before taking his job with the prosecutor's office, he was employed as a fire investigator with Pyr-Tech, the company that was partly owned by Buxton and was hired by Secura to investigate the cause and origin of the One Stop fire. Schuhmacher had worked directly under Buxton while employed at Pyr-Tech and had remained friendly with Buxton over the years.[3] Buxton and Schuhmacher had talked on the telephone before Buxton inspected the One Stop building on April 14, 1998, and Schuhmacher accompanied him on that inspection. Neither Schuhmacher nor Buxton mentioned their relationship with one another in their respective written reports regarding the cause and origin of the fire. Some of the government witnesses conceded, on cross-examination, that there was evidence of electrical arcing at the scene of the fire; some also conceded that, if styrofoam products were stored in the furnace room, as defendant later testified, that could explain the rapid acceleration of the fire because styrofoam is highly

---

[3]Indeed, Buxton, on cross-examination, credited himself with having taught Schuhmacher everything he knows.

flammable. Government witnesses further agreed on cross-examination that the fire could have spread in the same manner whether started accidentally or deliberately. They uniformly agreed that defendant cooperated fully with their investigations.

Defendant then moved at the close of the government's case for judgment of acquittal based upon insufficiency of the evidence. The motion was denied.

The defense presented three witnesses: (1) Ronald Gronemeyer, a fire cause-and-origin expert, (2) Lawrence Schnapp, defendant's father and the owner of the One Stop, and (3) defendant himself. Gronemeyer had been hired in 1998 by Lawrence Schnapp after Secura denied insurance coverage. He first investigated the scene of the fire on August 1, 1998. He testified that it was "difficult to impossible" to determine where in the furnace room the fire had started. He opined that there were several possible sources of ignition of the fire: electrical arcing at a flexible conduit, smoking materials in the trash, ignition of flammable vapors, or a deliberate human act. While he agreed that arson was a possibility, he could not say with reasonable certainty that arson was the cause.

Lawrence Schnapp, defendant's father, testified that he and his wife were the sole owners of One Suzy-Q Corp., d/b/a St. Clair One-Stop, as well as the restaurant property next door to the One Stop. He and his wife were out of town at the time of the fire. He had no problems with defendant's management of the One Stop prior to the fire. Although he was aware of defendant's business practices, including the routine bank overdrafting, he knew that defendant always managed to keep the business afloat. The restaurant property had recently produced a net monthly loss for them, so the One Stop had been covering the difference on that mortgage. The fire, and the denial of coverage by Secura, had financially devastated Lawrence Schnapp and his wife, who were left hundreds of thousands of dollars in debt.

Defendant took the stand on his own behalf. His testimony included, among other things, a description of the loss of items in the fire, such as important papers that were left out in the office. He also testified that there were three cases of styrofoam coolers and minnow buckets stored in the furnace room. He testified that he often stored trash bags in the furnace room and recalled that there were several such bags left there on the night of the fire. He confirmed that he had opened the store at 4:10 a.m. on April 9, 1998,[4] and had worked almost continuously for 19 hours that day. He also recalled that Brandy was very upset that day because of her mother's work-related accident and injuries. Both defendant and Brandy were smokers and, in addition, customers were permitted to smoke in the store. Defendant testified that Brandy did most of the cleaning up for the night and, notwithstanding his policy of not allowing cigarette butts to be put in the trash within the last hour and a half before closing, he had no way of knowing whether a customer or Brandy may have inadvertently discarded a smouldering cigarette butt in the trash on the night of the fire. In addition, defendant testified that, at the time of the fire, the store contained over $3,000 cash in the registers and the safe, $8,200-worth of lottery tickets, and $1,000 in change. Defendant also testified that his parents had full ownership of both the One Stop property and the restaurant property next door. As far as he knew, they were the only beneficiaries on the insurance policy.[5] Defendant's only income at the time of the fire was his salary for operating the One Stop. Finally, regarding the delinquent taxes, defendant explained that he could have avoided revocation of his business license by obtaining a last-minute bank loan, as he had always been able to do in the past.

---

[4]The security company records showed that the alarm had been turned off at 4:10 a.m. on the morning of April 9, 1998.

[5]According to defendant, he learned well after the fire that the insurance policy included employee salary coverage.

-7-

During defendant's testimony, defense counsel asked defendant if he and Schuhmacher had gone into the One Stop building together shortly after the fire was extinguished. Defendant answered that they had. At that point, the government asked to approach the bench. In a sidebar conference, counsel for the government stated that he believed defense counsel was about to ask defendant about statements made to him by Schuhmacher just after the fire. The government objected to this anticipated testimony on hearsay grounds. Defense counsel responded that the statements would not be offered for their truth but rather as prior inconsistent statements, to impeach Schuhmacher's testimony at trial regarding the cause of the fire. The district court noted that defense counsel had not questioned Schuhmacher about the alleged prior inconsistent statement despite having the opportunity to do so when cross-examining Schuhmacher during the government's case-in-chief. Upon the district court's indication that the evidence therefore would not be admitted, defense counsel made an offer of proof. According to defense counsel, he would have asked defendant whether or not he (defendant) and Schuhmacher had had a conversation in the One Stop building on the night of the fire regarding Schuhmacher's impression of the cause of the fire; defendant was expected to say "yes," and that Schuhmacher told him that the fire probably started high, probably in the ceiling, and burned downward. Trial transcript, Vol. IV, at 56. The district court then sustained the government's hearsay objection, and defense counsel resumed examining defendant, but on a different line of questioning.

At the close of the evidence, defendant again moved for judgment of acquittal on grounds of insufficiency of the evidence. The district court again denied the motion, and submitted the case to the jury. The jury thereafter found defendant guilty. Defendant was sentenced to 60 months imprisonment, 3 years supervised release, a $100 assessment, and restitution in the amount of $247,098.98. He appealed.

**Discussion**

Exclusion of evidence

Defendant argues on appeal that the district court abused its discretion in disallowing his testimony regarding the statement Schuhmacher allegedly made to him on the night of the fire. Defendant would have testified that Schuhmacher, upon inspecting the building's interior right after the fire, stated the opinion that the fire had started in the *ceiling* of the furnace room. According to defendant, this testimony would have supported the argument that Schuhmacher <u>changed</u> his opinion after discussing the matter with Buxton – his longtime mentor and friend, who was hired by the insurance company. After talking with Buxton, Schuhmacher began asserting that the fire appeared to have started on the *floor* of the furnace room. This evidence also would have explained why both Schuhmacher and Buxton completely failed to disclose in their written reports their longstanding relationship with one another and Schuhmacher's former employment with Pyr-Tech. It further would have explained why, on April 10th, Schuhmacher removed a fluorescent light fixture and a junction box from the ceiling of the furnace room despite his claim that he had ruled out the electrical systems as a source of the fire. Defendant argues that the district court abused its discretion in disallowing this evidence, notwithstanding Fed. R. Evid. 613(b).

Rule 613(b) provides in relevant part:

> **(b) Extrinsic evidence of prior inconsistent statement of witness**. Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require.

Defendant argues that the testimony in question should have been admitted because Schuhmacher was available to be recalled by the government on rebuttal. Defendant admits that defense counsel should have, on cross-examination during the government's case-in-chief, asked Schuhmacher about the statement he allegedly made to defendant right after the fire. Nevertheless, defendant argues, the government would not have been, and clearly was not, surprised by the prospect of defendant testifying about that statement as he had already done so in a deposition. Defendant also suggests that the interests of justice required full disclosure to the jury of Schuhmacher's lack of credibility, a "major issue in the case," which could have swayed the jury's ultimate finding of guilt. Defendant explains:

> It is painfully obvious that Schuhmacher wanted his finding to agree fully with those of the insurance company's origin and cause expert so he lied and said he'd not done any investigation, even though he clearly was in the building on the 9th and the 10th. It is clear, however, that, after meeting Buxton, his mentor, on April 14 and hearing [Buxton's] opinion on the origin (the floor) of the fire, Schuhmacher "fell into line" and abandoned the ceiling theory. His report so reflects this. . . . [T]he proffered testimony [i.e., that, on April 9th, Schuhmacher said he thought the fire started in the ceiling] . . . would have shown the jury [that Schuhmacher] is the kind of witness who would change his conclusions to conform with those of a more seasoned mentor.

Brief for Appellant at 33-34.

In response, the government argues that no abuse of discretion occurred in light of defense counsel's failure to ask Schuhmacher about his alleged statement on April 9th, despite ample opportunity to do so on cross-examination. The government also argues that the defense was really attempting to present Schuhmacher's statement for the truth of the statement, notwithstanding the claim that it was being offered for impeachment purposes. The government further suggests that the defense could have called Schuhmacher to the stand, asked him about the alleged statement, then called

defendant. Having failed to lay a proper foundation under Fed. R. Evid. 613(b), the government concludes, defendant should not now be afforded a new trial. For the reasons stated below, we agree.

As quoted above, Rule 613(b) provides that extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless: (1) the witness is afforded an opportunity to explain or deny the statement and the opposing party is afforded an opportunity to interrogate the witness about the statement or (2) the interests of justice otherwise require. The rule, on its face, does not require that the witness be cross-examined about the alleged prior inconsistent statement *before* that statement may be presented as impeachment evidence. Indeed, the advisory committee's notes explain:

> The familiar foundation requirement that an impeaching statement first be shown to the witness before it can be proved by extrinsic evidence is preserved but with some modifications. . . . The traditional insistence that the attendance of the witness be directed to the statement on cross-examination is relaxed in favor of simply providing the witness an opportunity to explain and the opposite party an opportunity to examine on the statement, *with no specification of any particular time or sequence*.

Fed. R. Evid. 613(b) advisory committee's notes (emphasis added). In fact, the latter part of the rule, referring to the interests of justice, indicates that such evidence may, under appropriate circumstances, be admitted even if the witness is never afforded an opportunity to explain or deny the alleged statement.

In United States v. Sutton, 41 F.3d 1257, 1260 (8th Cir. 1994), cert. denied, 514 U.S. 1072 (1995), as in the present case, testimony regarding a witness's prior inconsistent statement was disallowed by the trial judge "because [the witness] was not given the opportunity to explain or deny having made a prior inconsistent statement while he was on the stand, which is normally the proper foundation for

impeachment under Fed. R. Evid. 613(b)." On appeal, the defendant argued that, under Rule 613(b), the trial court should have admitted the testimony regarding the witness's prior inconsistent statement because the witness was available to be recalled to deny or explain the statement. We rejected the defendant's argument, explaining that such a procedure "is not mandatory, but is optional at the trial judge's discretion." Id. at 1260.[6]

In the present case, the district court had the option to allow defendant to testify regarding Schuhmacher's alleged prior inconsistent statement, and then permit the government to recall Schuhmacher to explain or deny the alleged statement. However, as the district court noted, defense counsel could have asked Schuhmacher to explain or deny the alleged statement while Schuhmacher was on the stand as a witness during the government's case-in-chief, but failed to do so. Upon careful review, we cannot say that the district court's decision to disallow defendant's testimony regarding Schuhmacher's alleged prior inconsistent statement rises to the level of an abuse of discretion.

Sufficiency of the evidence

Defendant also appeals the district court's denial of his motion for judgment of acquittal on grounds of insufficiency of the evidence to support the jury's verdict. We will reverse a conviction for insufficiency of the evidence if the government

---

[6]Therefore, because this court cited Sutton, 41 F.3d at 1260, for the proposition that "Rule 613(b) allows impeachment by a prior inconsistent statement only when a witness is first provided an opportunity to explain the statement," United States v. Dierling, 131 F.3d 722, 733 (8th Cir. 1997), cert. denied, 523 U.S. 1066 (1998), we read that statement in the context of Sutton's reference to what is "normally the proper foundation for impeachment under Fed. R. Evid. 613(b)." 41 F.3d at 1260. In other words, impeachment of a witness by a prior inconsistent statement is *normally* allowed only when the witness is first provided an opportunity to explain or deny the statement.

failed to prove beyond a reasonable doubt a fact necessary to establish the crime charged. See In re Winship, 397 U.S. 358, 364 (1970) ("[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."). However, "[a] motion for judgment of acquittal should only be granted 'where the evidence, viewed in the light most favorable to the government, is such that a reasonably minded jury must have a reasonable doubt as to the existence of any of the essential elements of the crime charged.'" United States v. Earles, 113 F.3d 796, 802 (8th Cir. 1997), cert. denied, 522 U.S. 1075 (1998). Neither the district court, nor this court on appeal, may weigh evidence or assess witness credibility when considering the sufficiency of the evidence to support the jury's guilty verdict. Id.

Defendant cites as instructive United States v. Yoakam, 116 F.3d 1346 (10th Cir. 1997), in which the Tenth Circuit reversed the defendant's arson conviction under circumstances somewhat similar to those in the present case. The Tenth Circuit held in Yoakam that, although the evidence of arson was convincing, the government's evidence of the defendant's guilt was insufficient as a matter of law because the evidence of his financial motivation required "speculation and conjecture" and the only physical evidence tying him to the fire was the fact that he was the last one to leave the building, just minutes before it burst into flames. Id. at 1350.

By comparison to Yoakam, defendant contends, the case at bar is even weaker. He contends that the government does not even have sufficient evidence to prove that the fire at the One Stop was indeed caused by arson. As to motive, defendant argues, the evidence showed that he and his wife – having no ownership interest in the business, the building, or the inventory, and relying only on their incomes as employees of the One Stop – had nothing to gain and everything to lose from the

destruction of the building.[7]  As to the government's reliance on the precarious way in which the business was operating in the weeks and months just prior to the fire, defendant suggests that, as a mere employee of the One Stop, he had no legal or financial obligations associated with the business and could have walked away at any time.  As to the physical evidence, defendant contends that, just as in Yoakam, there was nothing more than his mere presence in the building a few minutes before the fire broke out.  Defendant also emphasizes, among other things, that: he was extremely cooperative with all investigators; he immediately provided the keys to the firefighters so they could extinguish the fire; no indicia of arson, such as the appearance or odor of accelerants, were detected in the building or on defendant's person; and he denied being careless with smoking materials, even though such a representation would have supported the conclusion that the fire had started accidentally.  Defendant sums up by urging this court to hold, as a matter of law, that no reasonable jury could have found, beyond a reasonable doubt, that he intentionally caused the fire.

We agree with defendant that there are some factual similarities between the case at bar and Yoakam, but we also note some meaningful differences.  In Yoakam, there was an inconsistency in the government's evidence which undermined the government's theory of guilt: government witnesses testified that a liquid accelerant had been used to commit the arson, yet witnesses verified that the defendant did not smell of an accelerant such as gasolene or kerosene at the time of the fire.  116 F.3d at 1350.  There was no such factual inconsistency in the present case.  Moreover, in the case at bar there were circumstances beyond defendant's "mere presence" at the scene just before the fire started.  For example, after Brandy had exited the store on the night of the fire, defendant went back in the store for a minute or so, during which

---

[7]The Secura insurance policy contained a "business interruption" clause for salaries, but defendant testified that he was not aware of that provision until it was revealed in the litigation.

-14-

he was alone in the furnace room.  As a smoker, he likely would have had a lighter or matches on his person.  As to motivation, the government presented a strong case that defendant was at the end of his rope financially and may well have been desperate for any way out.  As the government points out, defendant's father was out of money, defendant had just obtained a $50,000 bank loan, the bank accounts were empty, he had bounced over 200 checks  in 1998 alone, sales taxes were due (meaning the business license was on the verge of revocation), and the gas storage tanks at the store were empty and in need of repair or replacement.  See Brief for Appellee at 25.

In sum, not only was there circumstantial evidence of arson, there was evidence of defendant's opportunity and means to commit the crime and evidence of his financial motivation, despite his lack of an ownership interest in the property.  Upon review of the evidence, therefore, we cannot say that a reasonable jury could not have found defendant guilty beyond a reasonable doubt.  Though far from overwhelming, the evidence was legally sufficient to support the jury's verdict.

### Conclusion

For the reasons stated, the judgment of the district court is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-15-