United States Court of Appeals
Fifth Circuit

**F I L E D**

**June 12, 2006**

**Charles R. Fulbruge III**
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 05-10045

_____

UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

versus

CHARLES WILLIAM HAMES;
JAMES MICHAEL DAVIS; and
ROBBIE LESA HAMES,

                                        Defendants-Appellants.

_____

No. 05-10375
Summary Calendar

_____

UNITED STATES OF AMERICA,

                                        Plaintiff-Appellant,

versus

JAMES MICHAEL DAVIS,

                                        Defendant-Appellee.

_____

Appeals from the United States District Court
for the Northern District of Texas
USDC No. 3:01-CR-323-2-P
_____

Before JONES, Chief Judge, and WIENER and PRADO, Circuit Judges.

PER CURIAM:[*]

Appellants Charles Williams Hames ("Pete Hames"), Robbie Lesa Hames ("Lesa Hames"), and James Michael Davis were convicted of conspiracy to commit healthcare fraud, mail fraud, making false statements, and other charges listed in a seventeen-count superseding indictment arising from a healthcare fraud scheme. Pete and Lesa Hames (collectively, "the Hameses") claim that the district court erred by excluding the impeachment testimony offered by one of their witnesses. All of the Appellants contend that evidence is insufficient to support their convictions and that their sentences violate *United States v. Booker*, 543 U.S. 220 (2005). For the following reasons, we AFFIRM Appellants's convictions, VACATE their sentences and REMAND for resentencing.

I.   BACKGROUND

Pete Hames and his wife, Lesa Hames, an attorney, owned and operated Alternate Nursing Care ("ANC"), a Medicare-funded home healthcare agency. Medicare reimbursed ANC for the cost of care for Medicare patients through Palmetto Government Benefits Administrators ("Palmetto"), a subsidiary of South Carolina Blue Cross/Blue Shield, which contracted with the Health Care Financing

---

[*]Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Administration ("HCFA")[1] to administer the Medicare program in Texas. Medicare reimburses only certain expenses, does not reimburse the costs associated with "related parties" or shell corporations, and does not allow providers to make a profit. At trial, the Government argued that, in 1996, the Hameses discovered that their reportable expenses were $600,000 less than what they had already received through estimated advances. The Government contended that instead of repaying this amount, with the help of Davis, a family friend and full-time maintenance worker at an apartment complex, they padded their expenses to keep the money.

At trial, the Government presented evidence suggesting that Davis assisted Lesa Hames to claim $120,000 in consulting services by signing a false, backdated contract purporting to show that Davis was earning $20,000 per month for healthcare consulting work.

The Government also argued that Davis assisted Lesa Hames by acting as the straw owner of Accelerated Home Health Personnel ("Accelerated"), a fake employee leasing company that Lesa Hames created. According to the Government, although Accelerated did not exist until March 1996, Davis signed backdated documents created in 1996 to make it appear that the company entered into employee leasing contracts with ANC in mid-1995 and early 1996. After Lesa opened Accelerated, she transferred almost all of ANC's employees to the company and leased them back to ANC at an inflated rate. The

---

[1] HCFA is now the Centers for Medicare and Medicaid Services.

Government suggests that ANC did not pay Accelerated the claimed employee leasing expenses. In addition, ANC did not actually pay Accelerated's employees more money. Instead, it continued to pay them the same amount as before the leasing agreement was executed.[2]

The Hameses, through their corporation RALA, also purchased a dilapidated office building in Irving ("Irving building") for $140,000 and began costly renovations to it. Shortly thereafter, the Hameses transferred RALA and its only asset, the Irving building, to Davis in exchange for a promissory note for $1.2 million. At trial, the Government presented evidence that Davis later represented to the Bank of the West that he had made $700,000 in payments on this $1.2 million note to secure a $500,000 loan when the money actually came from the Hameses. In connection with this scheme, Davis signed blank checks, backdated documents, and various lease agreements used to pad the Hameses' expenses for Medicare reporting purposes.

According to the Government, some of the Hameses' other fraudulent acts were simpler. For instance, Lesa Hames claimed as Medicare expenses the renovation of their home and the Irving building. In addition, while she used the Irving building for some

---

[2] The Government claimed that, notwithstanding the fact that Davis was Accelerated's owner, his sole task was to sign paychecks. He did not hire, fire, or otherwise manage the leased employees. In addition, evidence reflects that, even after Accelerated and ANC discontinued their purported lessor-lessee relationship, Davis routed ANC's Medicare funds from Accelerated to the Hameses' personal accounts.

non-Medicare related purposes, Lesa Hames claimed as a Medicare expense the entire amount of rent on the Irving building.

The Government argued that Davis and the Hameses operated these schemes until 1998, when Palmetto's auditors discovered and disallowed the fraudulent expenses. Larry Seals, the Palmetto investigator, determined that between 1996 and 1998, Medicare overpaid Appellants $2.2 million. Davis and his wife received over $500,000 of that amount.

At trial, the Government called twenty-three witnesses in its case-in-chief, including David Hames, Pete Hames's brother who also served as the accountant for the Hameses' companies. He testified that many of the Hameses' expenses were falsified in order to avoid reimbursing Medicare for being overpaid. During David Hames's cross-examination, the defense did not question him about any prior inconsistent statements. A week later, near the end of the defense's case-in-chief, Lesa Hames sought to introduce the testimony of Max Wayman, a defense investigator who interviewed David Hames before he began cooperating with the government investigation into ANC. Wayman was expected to testify that David Hames told him Appellants had not committed any crimes and that he believed the reported expenses were all legitimate. The Government objected to Wayman's testimony because the defense had not questioned David Hames about any prior inconsistent statements before attempting to proffer extrinsic evidence about them. The trial court sustained the objection.

5

On December 15, 2004, pursuant to the jury's guilty verdicts on all counts charged in the indictment, the district court sentenced Lesa Hames to 102 months imprisonment and Pete Hames and Davis to 70 months imprisonment each. The court also ordered Lesa Hames and Davis to serve three years of supervised release. Finally, the court ordered Appellants to pay, jointly and severally, $2,885,020 in restitution.

This appeal followed. Davis also filed a motion for release pending appeal in which he argued that there was a substantial question whether the evidence was sufficient to prove that he knowingly committed fraud. The district court granted release, and the Government's appeal of this issue has been consolidated with this case.

II.  DISCUSSION

   A.  *The Trial Court Did Not Err by Excluding Wayman's Testimony*

First, the Hameses contend that the trial court erred by excluding Wayman's testimony because the advisory committee's notes on the Federal Rules of Evidence suggest that the traditional requirement of providing the witness an opportunity to explain the contradictions before the admission of extrinsic evidence has been abolished.[3]

---

[3] The advisory committee's notes relax "the traditional insistence that the attendance of the witness be directed to the statement on cross-examination . . . in favor of simply providing the witness an opportunity to explain . . ., with no

6

We review a district court's ruling on exclusion of evidence for abuse of discretion. *United States v. Ragsdale*, 426 F.3d 765, 774 (5th Cir. 2005). "A trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence." *Id.* (quoting *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003)). If the district court abused its discretion in excluding the testimony, we will review that error for harmlessness. *Id.*

When the Hameses proposed to offer the testimony of Max Wayman to impeach David Hames with his prior inconsistent statements, the district court excluded Wayman's testimony under Fed. R. Evid. 613(b). That rule provides:

> Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require.

The Hameses point to the advisory committee's notes on the Federal Rules of Evidence and *United States v. Bibbs*, 564 F.2d 1165 (5th Cir. 1977), to support their argument that the trial court erred by excluding Wayman's testimony. In light of the Hameses'

specification of any particular time or sequence," Fed. R. Evid. 613(b) advisory committee's note.

obfuscation of the issue in *Bibbs*, our standard of review, and the amount of discretion afforded to the trial court, their reliance on *Bibbs* and the committee's notes is misguided. In *Bibbs*, the district court admitted extrinsic evidence of inconsistent statements made by a witness after she had testified, even though the proponent had not cross-examined her on the yet-to-be-made statements while she was still on the stand. *Id.* This Court affirmed, noting that the trial judge has wide discretion; and, even if the case had fallen under Rule 613(b), that rule does not "*require* that impeachment foundation precede the impeaching witness' testimony." *Id.* at 1169 (emphasis added). *Bibbs* does not stand for the proposition that a district court abuses its discretion when it in fact requires a foundation before admitting extrinsic evidence of the impeachment. In *Bibbs*, we merely cited the Rule 613(b) in suggesting that it would not be reversible error for a court to allow the impeaching witness' testimony to precede the impeachment foundation. To hold otherwise would severely limit the trial courts' broad discretion in controlling the manner and presentation of evidence at trial.[4] *See* FED. R. EVID. 611. Thus, we conclude

---

[4] Other circuits have concluded that, although trial courts have the option to allow extrinsic evidence without a prior foundation, it is not an abuse of discretion to refuse to admit it without that foundation. *See United States v. Surdow*, No. 04-2459CR, 2005 WL 332805 (2d Cir. Feb. 9, 2005) (unpublished) ("[A]n impeaching party that does not itself intend to confront a witness with the particulars of a purportedly inconsistent statement will, at the very least, 'inform[ ] the court and opposing counsel, at the time the witness testifies, of the

that the trial court did not abuse its discretion by excluding Wayman's testimony.[5]

   B.   *Evidence is Sufficient to Sustain the Hameses' Convictions For Making False Statements*

The Hameses also argue that, because they made false statements only to Palmetto, a private contractor, and Larry Seals, an auditor for Palmetto, they cannot be convicted under 18 U.S.C. §§ 1001 and 1516.  Specifically, they contend that their convictions cannot stand because the statutes require that falsehoods be made directly to a government agency or to an agent of the executive branch.  The

---

intention to introduce' impeaching extrinsic evidence . . . .(emphasis deleted)(quoting Weinstein's Federal Evidence § 613.05[5] at 613-28)); *United States v. Schnapp*, 322 F.3d 567, 572 (8th Cir. 2003) (finding no abuse of discretion when judge did not exercise his option to permit extrinsic evidence before confrontation of the original witness); *United States v. Sutton*, 41 F.3d 1257, 1260 (8th Cir. 1994) (finding no abuse of discretion to exclude extrinsic evidence testimony because the relaxation of the timing rule "is not mandatory, but is optional at the trial judge's discretion").

   [5] The government maintains that David Hames likely would have admitted that he made the prior inconsistent statement to Wayman. At the time Wayman interviewed David Hames, he was not yet cooperating with the government; indeed, he admitted on the stand that he had lied to a federal auditor about the very same subject matter.  If David Hames would have admitted making the inconsistent statement to Wayman, the Hameses' purported extrinsic evidence of Wayman's testimony would have been inadmissible. *See United States v. Greer*, 806 F.2d 556, 559 (5th Cir. 1986) (tape of prior inconsistent statement was inadmissible when the witness admitted he made the statement); *United States v. Roger*, 465 F.2d 996, 997-98 (5th Cir. 1972) (same); *cf. United States v. Avants*, 367 F.3d 433, 447-48 (5th Cir. 2004)("In order for a prior inconsistent statement to be admissible for impeachment purposes, there must be a preliminary finding that statements are inconsistent.").

9

Government argues that, although Palmetto is a private company, because it acts as Medicare's agent, the evidence is sufficient to affirm the Hameses' convictions under §§ 1001 and 1516.

We review the sufficiency of the Government's evidence to determine whether a rational trier of fact could have found Appellants guilty of their charged offenses beyond a reasonable doubt. *United States v. Gray*, 105 F.3d 956, 965 (5th Cir. 1997). "The evidence is viewed 'in the light most favorable to the verdict, accepting all credibility choices and reasonable inferences made by the jury.'" *Id.* (quoting *United States v. Blount*, 98 F.3d 1489, 1494 (5th Cir. 1996)). "The jury is free to choose among reasonable constructions of the evidence and the evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *United States v. Ferguson*, 211 F.3d 878, 883 (5th Cir. 2000).

Section 1001 permits for punishment of: "[W]hoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully——... (2) makes any materially false, fictitious, or fraudulent statement or representation." 18 U.S.C. § 1001. The Supreme Court has ruled that jurisdiction must be defined in a nontechnical manner and "covers all matters confided to the authority of an agency or department." *United States v. Rodgers*, 466 U.S. 475, 479 (1984). Accordingly, this Court has consistently

10

held that false statements need not be made directly to the government to fall "within the jurisdiction of" the government. *See*, *e.g.*, *United States v. Montemayor*, 712 F.2d 104, 106-09 (5th Cir. 1983) (finding that false statements to procure Texas birth certificates fell within the jurisdiction of § 1001 because "these false statements, although not made directly to the federal agency itself, may factually be held to be a matter within the jurisdiction of the federal agency"); *United States v. Uni Oil*, 646 F.2d 946, 954-55 (5th Cir. 1981) (noting that "it is well settled that a false statement need not be made directly to a federal agency in order to sustain a § 1001 conviction" and finding no deficiencies in an indictment charging false statements that were made to refiners who ultimately used those statements to submit calculations as required by an executive agency).

The HCFA administers Medicare for the government. In so doing, HCFA contracts with local companies to perform audits and distribute funds. Pursuant to HCFA's contract, Palmetto administers the Medicare program in Texas. Palmetto's contractual responsibilities include receiving, adjudicating and paying Medicare claims with government money. Accordingly, because Palmetto acts as Medicare's agent, a rational trier of fact could have found the Hameses guilty of 18 U.S.C. § 1001 beyond a reasonable doubt.

Similarly, a rational trier of fact could have found Lesa Hames guilty beyond a reasonable doubt of 18 U.S.C. § 1516, which

11

criminalizes the deception of a Federal auditor. The statute expressly defines "Federal auditor" as "any person employed on a . . . contractual basis to perform an audit or a quality assurance inspect for or *on behalf of* the United States." 18 U.S.C. § 1516 (emphasis added). Relying on *United States v. Plasser American Corporation*, 57 F. Supp. 2d 140 (E. Dist. Pa. 1999), however, Lesa Hames argues that only auditors paid directly by the United States, as opposed to auditors paid by an outside company who are then reimbursed by the United States, qualify under the statute. Her reliance on *Plasser* is misplaced. *Plasser* held that an auditor acting on behalf of federally funded Amtrak is not a Federal auditor for purposes of § 1516. Here, Palmetto is both federally funded and performing an audit at the direct behest of, and certainly on behalf of, the United States. Thus, the evidence presented at trial is sufficient to support Lesa Hames's conviction under 18 U.S.C. § 1516.

C. *Evidence is Sufficient to Sustain the Jury's Verdict on Davis's Intent to Defraud*

Davis argues he lacked an intent to defraud, and that consequently, the jury's verdict against him must be overturned for lack of sufficient evidence. "The requisite intent to defraud is established if the defendant acted knowingly and with the specific intent to deceive, ordinarily for the purpose of causing some financial loss to another or bringing about some financial gain to himself." *United States v. Doke*, 171 F.3d 240, 243 (5th Cir. 1999).

12

Specific intent can be proven through circumstantial evidence and inferences. *United States v. Ismoila*, 100 F.3d 380, 387 (5th Cir. 1996) ("[P]roof of [] intent can arise 'by inference from all of the facts and circumstances surrounding the transactions.'" (quoting *United States v. Keller*, 14 F.3d 1051, 1056 (5th Cir. 1994))); *see also United States v. Bieganowski*, 313 F.3d 264, 277 (5th Cir. 2002)(noting that "[c]ircumstances altogether inconclusive, if separately considered, may, by their number and joint operation, especially when corroborated by moral coincidences, be sufficient to constitute conclusive proof [of intent]" (quoting *United States v. Lechuga*, 888 F.2d 1472 (5th Cir. 1989))).

The jury simply did not believe that Davis lacked the intent to defraud. A reasonable construction of the evidence is such that a rational trier of fact could conclude that Davis at some point formed an intent to defraud. *See Bieganowski*, 313 F.3d at 289-90 (sufficient evidence for jury to infer deliberate indifference to fraud when defendant was aware of billing mistakes but simply directed a consultant to fix them); *United States v. Pennington*, 20 F.3d 593, 599 (sufficient evidence for jury to disbelieve defendants' story because of their circuitous route and disheveled appearance at the time of the crime). The record is replete with evidence that Davis had the intent to defraud. The record reflects that Davis signed numerous false, backdated contracts to help the Hameses pad their expenses for Medicare reporting purposes. In

13

addition, the jury could have believed that Davis routed ANC's Medicare funds to the Hameses' personal accounts and represented to the Bank of West that he had made $700,000 in payments on a $1.2 million note for the Irving building to secure a $500,000 loan. As a result, Davis and his wife received nearly $500,000 from all of these activities.

Given the evidence and the fact that this court does "not lightly overturn a determination by the trier of fact that the accused possessed the requisite intent," we affirm the jury's verdict against Davis. *See United States v. Robichaux*, 995 F.3d 565, 570 (5th Cir. 1993) (quoting *United States v. Aubrey*, 878 F.2d 825, 827 (5th Cir. 1989)).

D.   *Evidence is Sufficient to Sustain the Jury's Verdict on the Materiality of Davis's Misrepresentations*

Davis also claims that his conviction for bank fraud must be reversed because the evidence was insufficient for a jury to find that his misrepresentations to the Bank of the West were material. Davis represented to the bank that he had purchased a building for $1.2 million and made $700,000 in payments on it, even though the original purchase price was only $140,000 and the Hameses supplied the money. He validated these representations through falsified documents.

A statement is material if it "has a natural tendency to influence, or was capable of influencing the decision of" the lending institution. *United States v. Heath*, 970 F.2d 1397, 1403

14

(5th Cir. 1992)(quoting *Kungys v. United States*, 485 U.S. 759, 770 (1988)).

Bill Wood, a Bank of the West employee testified that the fact that Davis stated that he paid $700,000 on the $1.2 million note influenced the decision to approve Davis's loan.  This alone is sufficient for a jury to conclude that Davis's misrepresentations were material, viewing the evidence in the light most favorable to the verdict.

    E.   *Appellants' Sentences Violate Booker*

Appellants were sentenced pre-*Booker*.  They argue that their sentences violate the Sixth Amendment because they were based in part on facts that were neither admitted by them nor found beyond a reasonable doubt by the jury.  Additionally, they argue that the district court erred by sentencing them pursuant to a mandatory application of the United States Sentencing Guidelines.  *See United States v. Booker*, 543 U.S. 220 (2005).  The Government concedes that Appellants all preserved their *Booker* objections at the district court by citing *Blakely v. Washington*, 542 U.S. 296 (2004).  It further concedes that it cannot demonstrate that the *Booker* error was harmless.  *See United States v, Akpan*, 407 F.3d 360, 377 (5th Cir. 2005).  Accordingly, the cases must be remanded for resentencing in accordance with *Booker*.

Appellants also argue that *ex post facto* and due process concerns preclude the district court from applying Justice Breyer's

15

remedial opinion in *Booker* on remand. Those arguments are foreclosed by *United States v. Scroggins*, 411 F.3d 572, 575-77 (5th Cir. 2005). *See also United States v. Cruz*, 418 F.3d 481, 484 n.2 (5th Cir. 2005) (not considering ex post facto/due process challenges because the case was remanded for resentencing, but noting that those challenges were foreclosed).

III. CONCLUSION

For the foregoing reasons, we AFFIRM Appellants's convictions, VACATE their sentences, and REMAND for resentencing. Having affirmed Davis's conviction, we refer the Government's appeal of the motion for his release pending appeal to the district court for consideration in light of this opinion.